# LANDMARK COMMUNICATIONS, INC. *v.* VIRGINIA

No. 76–1450.  Argued January 11, 1978—Decided May 1, 1978

BURGER, C. J., delivered the opinion of the Court, in which WHITE, MARSHALL, BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. STEWART, J., filed an opinion concurring in the judgment, *post,* p. 848. BRENNAN and POWELL, JJ., took no part in the consideration or decision of the case.

*Floyd Abrams* argued the cause for appellant. With him on the briefs were *Dean Ringel, Conrad M. Shumadine,* and *John O. Wynne.*

*James E. Kulp,* Assistant Attorney General of Virginia, argued the cause for appellee. With him on the brief was *Anthony F. Troy,* Attorney General.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented on this appeal is whether the Commonwealth of Virginia may subject persons, including newspapers, to criminal sanctions for divulging information regarding proceedings before a state judicial review commission which is authorized to hear complaints as to judges' disability or misconduct, when such proceedings are declared confidential by the State Constitution and statutes.[1]

---

*Briefs of *amici curiae* urging reversal were filed by *Stephen W. Bricker, Bruce J. Ennis, Joel M. Gora,* and *Philip J. Hirschkop* for the American Civil Liberties Union et al.; by *Arthur B. Hanson* and *Frank M. Northam* for the American Newspaper Publishers Assn.; by *Christopher B. Fager, William G. Mullen,* and *James R. Cregan* for the National Newspaper Assn. et al.; and by *Edward Bennett Williams* and *John B. Kuhns* for the Washington Post Co. et al.

[1] Article 6, § 10, of the Constitution of Virginia provides in relevant part: "The General Assembly shall create a Judicial Inquiry and Review Commission consisting of members of the judiciary, the bar, and the public and

# I

On October 4, 1975, the Virginian Pilot, a Landmark newspaper, published an article which accurately reported on a pending inquiry by the Virginia Judicial Inquiry and Review Commission and identified the state judge whose conduct was being investigated. The article reported that "[n]o formal complaint has been filed by the commission against '[the judge], indicating either that the five-man panel found insufficient cause for action or that the case is still under review." App. 47a. A month later, on November 5, a grand jury indicted Landmark for violating Va. Code § 2.1–37.13 (1973) by "unlawfully divulg[ing] the identification of a Judge of a Court not of record, which said Judge was the subject of an investigation and hearing" by the Commission.

The trial commenced on December 16, 1975, after the court

---

vested with the power to investigate charges which would be the basis for retirement, censure, or removal of a judge. The Commission shall be authorized to conduct hearings and to subpoena witnesses and documents. Proceedings before the Commission shall be confidential."

Virginia Code § 2.1–37.13 (1973) implements the constitutional mandate of confidentiality. It provides in relevant part:

"All papers filed with and proceedings before the Commission, and under the two preceding sections (§§ 2.1–37.11, 2.1–37.12), including the identification of the subject judge as well as all testimony and other evidence and any transcript thereof made by a reporter, shall be confidential and shall not be divulged by any person to anyone except the Commission, except that the record of any proceeding filed with the Supreme Court shall lose its confidential character.

.        .        .        .        .

"Any person who shall divulge information in violation of the provisions of this section shall be guilty of a misdemeanor."

Rule 10 of the Rules of the Commission is to the same effect:

"All papers filed with and all proceedings before the Commission are confidential pursuant to § 2.1–37.13, Code of Virginia (1950), that the same shall not be divulged, and a violation thereof is a misdemeanor and punishable as provided by law."

had denied Landmark's motion to quash or dismiss the indictment on the grounds that the statutory provision did not in terms apply to the article in question, and that it could not be so applied consistently with the First and Fourteenth Amendments. The essential facts were stipulated, and revealed that at the time the article was published the Commission had not filed a formal complaint with the Supreme Court of Virginia concerning the judge under investigation.[2] The only witness at the trial, Joseph W. Dunn, Jr., Managing Editor of the Virginian Pilot, testified that he decided to print the information about the Commission proceedings because he felt that the subject was a matter of public importance which should be brought to the attention of the Pilot's readers. Mr. Dunn acknowledged he was aware that it was a misdemeanor for anyone participating in Commission proceedings to divulge information about those proceedings, but testified that he did not understand the statute to apply to newspaper reports about the proceedings. He further testified that no reporter, employee, or representative of Landmark had been subpoenaed by or had appeared before the Commission in connection with the proceedings described in the October 4 article.

The case was tried without a jury, and Landmark was found guilty and fined $500 plus the costs of prosecution. The Supreme Court of Virginia affirmed the conviction, with one dissent. That court characterized the case as involving "a confrontation between the First Amendment guaranty of freedom of the press and a Virginia statute which imposes criminal sanctions for breach of the confidentiality of proceedings before the Judicial Inquiry and Review Commission." At the outset it rejected Landmark's claim that Va. Code § 2.1–37.13 (1973) applied only to the participants in a Commission proceeding or to the initial disclosure of confidential infor-

---

[2] Upon the filing of a complaint with the Supreme Court of Virginia, the records of the proceedings before the Commission lose their confidential character. Va. Code § 2.1–37.13 (1973).

mation. "Clearly, Landmark's actions violated [the statute] and rendered it liable to imposition of the sanctions prescribed . . . ." 217 Va. 699, 703, 233 S. E. 2d 120, 123.

Turning then to the constitutional question, the court noted that it was one of first impression and of broad significance because of the large number of other States in addition to Virginia which have comparable statutes requiring confidentiality with respect to judicial inquiry commissions. The court emphasized that the issue was not one of prior restraint but instead involved a sanction subsequent to publication. Accordingly, it concluded that the "clear and present danger test" was the appropriate constitutional benchmark. It identified three functions served by the requirement of confidentiality in Commission proceedings: (a) protection of a judge's reputation from the adverse publicity which might flow from frivolous complaints, (b) maintenance of confidence in the judicial system by preventing the premature disclosure of a complaint before the Commission has determined that the charge is well founded, and (c) protection of complainants and witnesses from possible recrimination by prohibiting disclosure until the validity of the complaint has been ascertained. The court concluded:

> "Considering these matters, we believe it can be said safely, without need of hard in-court evidence, that, absent a requirement of confidentiality, the Judicial Inquiry and Review Commission could not function properly or discharge effectively its intended purpose. Thus, sanctions are indispensable to the suppression of a clear and present danger posed by the premature disclosure of the Commission's sensitive proceedings—the imminent impairment of the effectiveness of the Commission and the accompanying immediate threat to the orderly administration of justice." *Id.,* at 712, 233 S. E. 2d, at 129.

In dissent, Justice Poff took the position that as applied to

Landmark the statute violated the First Amendment. We noted probable jurisdiction, 431 U. S. 964, and we now reverse.[3]

## II

At the present time it appears that 47 States, the District of Columbia, and Puerto Rico have established, by constitution, statute, or court rule, some type of judicial inquiry and disciplinary procedures.[4] All of these jurisdictions, with the apparent exception of Puerto Rico, provide for the confidentiality of judicial disciplinary proceedings, although in most the guarantee of confidentiality extends only to the point when a formal complaint is filed with the State Supreme Court or equivalent body.[5] Cf. ABA Project on Standards for Criminal Justice, Function of the Trial Judge § 9.1 (App. Draft 1972).

---

[3] Eight days after the decision of the Supreme Court of Virginia, the United States District Court for the Eastern District of Virginia issued a temporary injunction restraining prosecution of Richmond television station WXEX for violation of the same Virginia law under which Landmark was prosecuted. *Nationwide Communications, Inc.* v. *Backus,* No. 77–0139–R (Mar. 15, 1977). Thereafter, Richmond Newspapers, Inc., the publisher of two Richmond, Va., newspapers, was also charged under § 2.1–37.13. On April 5, 1977, the District Court denied the publisher's motion to enjoin the pending prosecution and a conviction for two violations of the statute resulted. Upon conclusion of the case, the District Court enjoined further prosecution of the publisher under the statute. Appellant then secured a temporary restraining order against further prosecution under the statute for the limited purpose of allowing it to publish an Associated Press story about a current Commission investigation which the Richmond newspapers were free to publish because of the court order shielding them from prosecution. *Landmark Communications, Inc.* v. *Campbell,* No. 77–404–N (ED Va., June 17, 1977). The temporary restraining order expired on June 20, 1977.

[4] Several bills are also pending in Congress providing for somewhat similar inquiry into the conduct of federal judges. See, *e. g.,* H. R. 1850, 95th Cong., 1st Sess. (1977); H. R. 9042, 95th Cong., 1st Sess. (1977); S. 1423, 95th Cong., 1st Sess. (1977).

[5] The relevant state constitutional provisions, statutes, and court rules are listed as an appendix to this opinion. Confidentiality of proceedings

The substantial uniformity of the existing state plans suggests that confidentiality is perceived as tending to insure the ultimate effectiveness of the judicial review commissions. First, confidentiality is thought to encourage the filing of complaints and the willing participation of relevant witnesses by providing protection against possible retaliation or recrimination.[6] Second, at least until the time when the meritorious can be separated from the frivolous complaints, the confidentiality of the proceedings protects judges from the injury which might result from publication of unexamined and unwarranted complaints. And finally, it is argued, confidence in the judiciary as an institution is maintained by avoiding premature announcement of groundless claims of judicial misconduct or disability since it can be assumed that some frivolous complaints will be made against judicial officers who rarely can satisfy all contending litigants. See generally W. Braithwaite, Who Judges the Judges? 161–162 (1971); Buckley, The Commission on Judicial Qualifications: An Attempt to Deal with Judicial Misconduct, 3 U. San Fran. L. Rev. 244, 255–256 (1969).

In addition to advancing these general interests, the confidentiality requirement can be said to facilitate the work of the commissions in several practical respects. When removal or retirement is justified by the charges, judges are more likely

---

is also an integral aspect of the proposals currently pending in Congress. See H. R. 1850, *supra*, § 382; H. R. 9042, *supra*, § 382; S. 1423, *supra*, § 381. None of these bills impose criminal sanctions for a breach of the confidentiality requirement.

[6] According to appellee, under the Virginia plan, the name of the complainant as such is never revealed to the judge under investigation even when a complaint is filed with the Supreme Court. All complaints other than the original are filed in the name of the Commission; the original complaint is not made a part of any public record. The identity of the witnesses heard by the Commission, however, would presumably be a part of the Commission's records which are made public if a complaint is filed with the Supreme Court.

to resign voluntarily or retire without the necessity of a formal proceeding if the publicity that would accompany such a proceeding can thereby be avoided.[7]   Of course, if the charges become public at an early stage of the investigation, little would be lost—at least from the judge's perspective—by the commencement of formal proceedings.   In the more common situation, where the alleged misconduct is not of the magnitude to warrant removal or even censure, the confidentiality of the proceedings allows the judge to be made aware of minor complaints which may appropriately be called to his attention without public notice.   See Braithwaite, *supra*, at 162–163.

Acceptance of the collective judgment that confidentiality promotes the effectiveness of this mode of scrutinizing judicial conduct and integrity, however, marks only the beginning of the inquiry.   Indeed, Landmark does not challenge the requirement of confidentiality, but instead focuses its attack on the determination of the Virginia Legislature, as construed by the Supreme Court, that the "divulging" or "publishing" of information concerning the work of the Commission by third parties, not themselves involved in the proceedings, should be criminally punishable.   Unlike the generalized mandate of confidentiality, the imposition of criminal sanctions for its breach is not a common characteristic of the state plans;

---

[7] "The experience in California has been that not less than two or three judges a year have either retired or resigned voluntarily, rather than to confront the particular charges that are made. . . .   The important thing is that [these cases] are closed without any public furor, or without any harm done to the judiciary, because the existence and the procedures of the commission has caused the judge himself to recognize the situation that exists and to avail himself of retirement."   Hearings on S. 1110 before the Subcommittee on Improvements in Judicial Machinery of the Senate Committee on the Judiciary, 94th Cong., 2d Sess., 120 (1976) (testimony of Jack E. Frankel, Executive Officer of the California Commission on Judicial Qualifications).

indeed only Virginia and Hawaii appear to provide criminal sanctions for disclosure.[8]

## III

The narrow and limited question presented, then, is whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings of the Judicial Inquiry and Review Commission.[9] We are not here concerned with the possible applicability of the statute to one who secures the information by illegal means and thereafter divulges it. We do not have before us any constitutional challenge to a State's power to keep the Commission's proceedings confidential or to punish participants for breach of this mandate.[10] Cf. *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539, 564 (1976); *id.,* at 601 n. 27 (BRENNAN, J., concurring in judgment); *Wood* v. *Georgia,* 370 U. S. 375, 393–394 (1962). Nor does Landmark argue for any constitutionally compelled right of access for the press to those proceedings. Cf. *Saxbe* v. *Washington Post Co.,* 417

---

[8] Hawaii Rev. Stat. § 610-3 (b) (1976) provides in relevant part:

"Any commission member or individual . . . who divulges information concerning the charge prior to the certification of the charge by the commission . . . shall be guilty of a felony which shall be punishable by a fine of not more than $5000 or imprisonment of not more than five years, or both."

[9] Landmark argued below that the statute was unclear with regard to whether the proscription against divulging information concerning a Commission proceeding applied to third parties as well as those who actually participated in the proceedings. The Supreme Court of Virginia, over the dissent of Justice Poff, construed the statutory language so as to encompass appellant. Although a contrary construction might well save the statute from constitutional invalidity, "it is not our function to construe a state statute contrary to the construction given it by the highest court of a State." *O'Brien* v. *Skinner,* 414 U. S. 524, 531 (1974).

[10] At least two categories of "participants" come to mind: Commission members and staff employees, and witnesses or putative witnesses not officers or employees of the Commonwealth. No issue as to either of these categories is presented by this case.

U. S. 843 (1974); *Pell* v. *Procunier,* 417 U. S. 817 (1974). Finally as the Supreme Court of Virginia held, and appellant does not dispute, the challenged statute does not constitute a prior restraint or attempt by the State to censor the news media.

Landmark urges as the dispositive answer to the question presented that truthful reporting about public officials in connection with their public duties is always insulated from the imposition of criminal sanctions by the First Amendment. It points to the solicitude accorded even untruthful speech when public officials are its subjects, see, *e. g., New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), and the extension of First Amendment protection to the dissemination of truthful commercial information, see, *e. g., Virginia State Board of Pharmacy* v. *Virginia Citizens Consumer Council,* 425 U. S. 748 (1976); *Linmark Associates, Inc.* v. *Willingboro,* 431 U. S. 85 (1977), to support its contention. We find it unnecessary to adopt this categorical approach to resolve the issue before us. We conclude that the publication Virginia seeks to punish under its statute lies near the core of the First Amendment, and the Commonwealth's interests advanced by the imposition of criminal sanctions are insufficient to justify the actual and potential encroachments on freedom of speech and of the press which follow therefrom. See, *e. g., Buckley* v. *Valeo,* 424 U. S. 1, 64–65 (1976).

## A

In *Mills* v. *Alabama,* 384 U. S. 214, 218 (1966), this Court observed: "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs." [11]  Al-

---

[11] The interdependence of the press and the judiciary has frequently been acknowledged. "The freedom of the press in itself presupposes an independent judiciary through which that freedom may, if necessary, be vindicated. And one of the potent means for assuring judges their

though it is assumed that judges will ignore the public clamor or media reports and editorials in reaching their decisions and by tradition will not respond to public commentary, the law gives "[j]udges as persons, or courts as institutions . . . no greater immunity from criticism than other persons or institutions." *Bridges* v. *California,* 314 U. S. 252, 289 (1941) (Frankfurter, J., dissenting). The operations of the courts and the judicial conduct of judges are matters of utmost public concern.

> "A responsible press has always been regarded as the handmaiden of effective judicial administration . . . . Its function in this regard is documented by an impressive record of service over several centuries. The press does not simply publish information about trials but guards against the miscarriage of justice by subjecting the police, prosecutors, and judicial processes to extensive public scrutiny and criticism." *Sheppard* v. *Maxwell,* 384 U. S. 333, 350 (1966).

Cf. *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 492 (1975).

The operation of the Virginia Commission, no less than the operation of the judicial system itself, is a matter of public interest, necessarily engaging the attention of the news media. The article published by Landmark provided accurate factual information about a legislatively authorized inquiry pending before the Judicial Inquiry and Review Commission, and in so doing clearly served those interests in public scrutiny and discussion of governmental affairs which the First Amendment was adopted to protect. See *New York Times Co.* v. *Sullivan, supra,* at 269–270.

## B

The Commonwealth concedes that "[w]ithout question the First Amendment seeks to protect the freedom of the press

---

independence is a free press." *Pennekamp* v. *Florida,* 328 U. S. 331, 355 (1946) (Frankfurter, J., concurring).

to report and to criticize judicial conduct," Brief for Appellee 17, but it argues that such protection does not extend to the publication of information "which by Constitutional mandate is to be confidential." *Ibid.* Our recent decision in *Cox Broadcasting Corp.* v. *Cohn, supra,* is relied upon to support this interpretation of the scope of the freedom of speech and press guarantees. As we read *Cox,* it does not provide the answer to the question now confronting us. Our holding there was that a civil action against a television station for breach of privacy could not be maintained consistently with the First Amendment when the station had broadcast only information which was already in the public domain. "At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records." 420 U. S., at 496. The broader question—whether the publication of truthful information withheld by law from the public domain is similarly privileged—was not reached and indeed was explicitly reserved in *Cox. Id.,* at 497 n. 27. We need not address all the implications of that question here, but only whether in the circumstances of this case Landmark's publication is protected by the First Amendment.

The Commonwealth also focuses on what it perceives to be the pernicious effects of public discussion of Commission proceedings to support its argument. It contends that the public interest is not served by discussion of unfounded allegations of misconduct which defames honest judges and serves only to demean the administration of justice. The functioning of the Commission itself is also claimed to be impeded by premature disclosure of the complainant, witnesses, and the judge under investigation. Criminal sanctions minimize these harmful consequences, according to the Commonwealth, by ensuring that the guarantee of confidentiality is more than an empty promise.

It can be assumed for purposes of decision that confidentiality of Commission proceedings serves legitimate state interests. The question, however, is whether these interests are sufficient to justify the encroachment on First Amendment guarantees which the imposition of criminal sanctions entails with respect to nonparticipants such as Landmark. The Commonwealth has offered little more than assertion and conjecture to support its claim that without criminal sanctions the objectives of the statutory scheme would be seriously undermined. While not dispositive, we note that more than 40 States having similar commissions have not found it necessary to enforce confidentiality by use of criminal sanctions against nonparticipants.[12]

Moreover, neither the Commonwealth's interest in protecting the reputation of its judges, nor its interest in maintaining the institutional integrity of its courts is sufficient to justify the subsequent punishment of speech at issue here, even on the assumption that criminal sanctions do in fact enhance the guarantee of confidentiality. Admittedly, the Commonwealth has an interest in protecting the good repute of its judges, like that of all other public officials. Our prior cases have firmly established, however, that injury to official reputation is an insuffi-

---

[12] A number of States provide that a breach of the confidentiality requirement by commission members or staff is punishable as contempt. *E. g.,* Rule 4.130 (2) of the Kentucky Supreme Court; Rule 3 (g) of the Massachusetts Committee on Judicial Responsibility. Other States require witnesses as well as staff and commission members to take an oath of secrecy, violation of which is treated as contempt. *E. g.,* Rule 25 (c) of the Florida Judicial Qualifications Commission; Rule S (2) of the Minnesota Board on Judicial Standards (witnesses only); Rule 7 (c) of the Procedural Rules and Regulations of the New Mexico Judicial Standards Commission; Rule 1 (c) of the Rules of Procedure Governing the Pennsylvania Judicial Inquiry and Review Board (witnesses only). No similar provision relating to the conduct of participants in Commission proceedings is contained in the Rules of the Virginia Judicial Inquiry and Review Commission.

cient reason "for repressing speech that would otherwise be free." *New York Times Co.* v. *Sullivan,* 376 U. S., at 272–273. See also *Garrison* v. *Louisiana,* 379 U. S. 64, 67 (1964). The remaining interest sought to be protected, the institutional reputation of the courts, is entitled to no greater weight in the constitutional scales. See *New York Times Co.* v. *Sullivan, supra.* As Mr. Justice Black observed in *Bridges* v. *California,* 314 U. S., at 270–271:

> "The assumption that respect for the judiciary can be won by shielding judges from published criticism wrongly appraises the character of American public opinion. . . . [A]n enforced silence, however limited, solely in the name of preserving the dignity of the bench, would probably engender resentment, suspicion, and contempt much more than it would enhance respect."

Mr. Justice Frankfurter, in his dissent in *Bridges,* agreed that speech cannot be punished when the purpose is simply "to protect the court as a mystical entity or the judges as individuals or as anointed priests set apart from the community and spared the criticism to which in a democracy other public servants are exposed." *Id.,* at 291–292.

The Commonwealth has provided no sufficient reason for disregarding these well-established principles. We find them controlling and, on this record, dispositive.

## IV

The Supreme Court of Virginia relied on the clear-and-present-danger test in rejecting Landmark's claim. We question the relevance of that standard here; moreover we cannot accept the mechanical application of the test which led that court to its conclusion. Mr. Justice Holmes' test was never intended "to express a technical legal doctrine or to convey a formula for adjudicating cases." *Pennekamp* v. *Florida,* 328 U. S. 331, 353 (1946) (Frankfurter, J., concurring). Properly

applied, the test requires a court to make its own inquiry into the imminence and magnitude of the danger said to flow from the particular utterance and then to balance the character of the evil, as well as its likelihood, against the need for free and unfettered expression. The possibility that other measures will serve the State's interests should also be weighed.

Landmark argued in the Supreme Court of Virginia that "before a state may punish expression, it must prove by 'actual facts' the existence of a clear and present danger to the orderly administration of justice." 217 Va., at 706, 233 S. E. 2d, at 125. The court acknowledged that the record before it was devoid of such "actual facts," but went on to hold that such proof was not required when the legislature itself had made the requisite finding "that a clear and present danger to the orderly administration of justice would be created by divulgence of the confidential proceedings of the Commission." *Id.*, at 708, 233 S. E. 2d, at 126. This legislative declaration coupled with the stipulated fact that Landmark published the disputed article was regarded by the court as sufficient to justify imposition of criminal sanctions.

Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake. In *Pennekamp* v. *Florida, supra,* at 335, Mr. Justice Reed observed that this Court is

> "compelled to examine for [itself] the statements in issue and the circumstances under which they were made to see whether or not they do carry a threat of clear and present danger to the impartiality and good order of the courts or whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect."

Mr. Justice Brandeis was even more pointed in his concurrence in *Whitney* v. *California,* 274 U. S. 357, 378–379 (1927):

> "[A legislative declaration] does not preclude enquiry into the question whether, at the time and under the cir-

cumstances, the conditions existed which are essential to validity under the Federal Constitution. . . . Whenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open to a defendant to present the issue whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature."

A legislature appropriately inquires into and may declare the reasons impelling legislative action but the judicial function commands analysis of whether the specific conduct charged falls within the reach of the statute and if so whether the legislation is consonant with the Constitution. Were it otherwise, the scope of freedom of speech and of the press would be subject to legislative definition and the function of the First Amendment as a check on legislative power would be nullified.

It was thus incumbent upon the Supreme Court of Virginia to go behind the legislative determination and examine for itself "the particular utteranc[e] here in question and the circumstances of [its] publication to determine to what extent the substantive evil of unfair administration of justice was a likely consequence, and whether the degree of likelihood was sufficient to justify [subsequent] punishment." *Bridges* v. *California*, 314 U. S., at 271. Our precedents leave little doubt as to the proper outcome of such an inquiry.

In a series of cases raising the question of whether the contempt power could be used to punish out-of-court comments concerning pending cases or grand jury investigations, this Court has consistently rejected the argument that such commentary constituted a clear and present danger to the administration of justice. See *Bridges* v. *California, supra; Penne-*

*kamp* v. *Florida, supra; Craig* v. *Harney,* 331 U. S. 367 (1947); *Wood* v. *Georgia,* 370 U. S. 375 (1962). What emerges from these cases is the "working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished," *Bridges* v. *California, supra,* at 263, and that a "solidity of evidence," *Pennekamp* v. *Florida, supra,* at 347, is necessary to make the requisite showing of imminence. "The danger must not be remote or even probable; it must immediately imperil." *Craig* v. *Harney, supra,* at 376.

The efforts of the Supreme Court of Virginia to distinguish those cases from this case are unpersuasive. The threat to the administration of justice posed by the speech and publications in *Bridges, Pennekamp, Craig,* and *Wood* was, if anything, more direct and substantial than the threat posed by Landmark's article. If the clear-and-present-danger test could not be satisfied in the more extreme circumstances of those cases, it would seem to follow that the test cannot be met here. It is true that some risk of injury to the judge under inquiry, to the system of justice, or to the operation of the Judicial Inquiry and Review Commission may be posed by premature disclosure, but the test requires that the danger be "clear and present" and in our view the risk here falls far short of that requirement. Moreover, much of the risk can be eliminated through careful internal procedures to protect the confidentiality of Commission proceedings.[13] Cf. *Nebraska Press Assn.* v. *Stuart,* 427 U. S., at 564; *id.,* at 601 n. 27 (BRENNAN, J., concurring in judgment). In any event, we must conclude as we did in *Wood* v. *Georgia,* that "[t]he type of 'danger' evidenced by the record is precisely one of the types of activity envisioned by the Founders in presenting the First Amendment for ratification." 370 U. S., at 388.

Accordingly, the judgment of the Supreme Court of Vir-

---

[13] See n. 12, *supra.*

ginia is reversed, and the case remanded for further proceedings not inconsistent with this opinion.[14]

*Reversed and remanded.*

MR. JUSTICE BRENNAN and MR. JUSTICE POWELL took no part in the consideration or decision of this case.

## APPENDIX TO OPINION OF THE COURT

A total of 49 jurisdictions now have some mechanism for inquiring into judicial disability and conduct. With the one exception of Puerto Rico, all of the remaining jurisdictions impose some requirement of confidentiality through constitutional, statutory, or administrative provisions. The relevant provisions are listed below:

Alabama: Const. Amdt. No. 328, § 6.17 (1977), Rule 5 of Rules of Procedure of the Judicial Inquiry Commission; Alaska: Stat. Ann. § 22.30.060 (1977), Rule 2 of the Commission on Judicial Qualifications; Arizona: Const., Art. 6.1, § 5, Rule 10 of the Rules of Procedure for the Commission on Judicial Qualifications; Arkansas: Stat. Ann. §§ 22–145 (f) and 22–1004 (b) (Supp. 1977); California: Const., Art. 6, § 18 (f), Rule 902 of Title III (Miscellaneous Rules) Div. I (Rules for Censure, Removal, Retirement or Private Admonishment of Judges); Colorado: Const., Art. 6, § 23 (3) (d), Rule 3 of Rules of Procedure of the Commission on Judicial Qualifications; Connecticut: Gen. Stat. §§ 51c, 51d (1977), and § 6 of 1977 Pub. Act 77–494; Delaware: Const., Art. 4, § 37, Rule 10 (d) of Rules of Procedure of the Court on the Judiciary; District of Columbia: Code § 11–1528 (1973), Rule 1.4 (b) of the Rules and Regulations of the Commission on Judicial Disabilities and Tenure; Florida: Const., Art. 5, § 12 (d), Rule 25 of the Judicial Qualifications Commission; Georgia: Const., Art. 6,

---

[14] Appellant also attacks the Virginia statute generally on vagueness and overbreadth grounds. Our resolution of the question presented makes it unnecessary to address these issues.

§ 13, ¶ 3, Rule 18 of Rules of the Judicial Qualifications Commission; Hawaii: Rev. Stat. §§ 610-3 (a), 610-12 (b) (1976), Rule 15 of the Rules of Practice and Procedure of the Commission for Judicial Qualification; Idaho: Code § 1-2103 (Supp. 1977), Rule 24 of the Judicial Council; Illinois: Const., Art. 6, § 15 (c), Rule 5 of the Rules of Procedure of the Judicial Inquiry Board; Indiana: Const., Art. 7, § 11, Code § 33-2.1-5-3 (1976), Rule 5 of the Rules of the Judicial Qualifications Commission; Iowa: Code § 605.28 (1977); Kansas: Stat. Ann. § 20-175 (1974), Rule No. 607 of the Rules of the Supreme Court Relating to Judicial Conduct; Kentucky: Rule 4.130 of the Rules of Court; Louisiana: Const., Art. 5, § 25 (C), Rule 10 of the Judiciary Commission; Maryland: Const., Art. 4, § 4B (a), Rule 1227 §§ e, r, of the Rules of Procedure; Massachusetts: Rule 3 of the Committee on Judicial Responsibility; Michigan: Const., Art. 6, § 30 (2), Rule 932.22 of the Supreme Court Administrative Rules; Minnesota: Stat. § 490.16 (5) (1976); Rule S of the Commission on Judicial Standards; Missouri: Rule 12.23 of the Commission on Retirement, Removal and Discipline; Montana: Rev. Codes Ann. § 93-723 (Supp. 1977), Rule 7 of the Judicial Standards Commission; Nebraska: Const., Art. 5, § 30 (3), Rev. Stat. § 24.726 (1975), Rule 2 of the Commission on Judicial Qualifications; Nevada: Const., Art. 6, § 21 (3), Rule 4 of the Revised Interim Procedural Rules of the Commission on Judicial Discipline; New Hampshire: Rev. Stat. Ann. § 490:4 (Supp. 1975), Rule 28 of the Supreme Court Rules; New Jersey: Rule 2:15-11 (e) of the Rules Governing Appellate Practice in the Supreme Court and the Appellate Division of the Superior Court; New Mexico: Const., Art. 6, § 32, Rule 7 of Procedural Rules and Regulations of the Judicial Standards Commission; New York: Jud. Law § 44 (McKinney Supp. 1977); North Carolina: Gen. Stat. § 7A-377 (a) (Supp. 1977), Rule 4 of the Judicial Standards Commission; North Dakota: Cent. Code § 27-23-03 (5) (Supp. 1977), Rule 4 of the Judicial Qualifications Com-

mission; Ohio: Rule 5 (21) of the Supreme Court Rules of Practice; Oklahoma: Stat., Tit. 20, § 1658 (Supp. 1976), Rule 5 (C) of the Council on Judicial Complaints; Oregon: Rev. Stat. §§ 1.420 (2), 1.440 (1977), Rule 7 of the Rules of Procedure of the Commission on Judicial Fitness; Pennsylvania: Const., Art. 5, § 18 (h), Rules 1, 20 of the Rules of Procedure of the Judicial Inquiry and Review Board; Rhode Island: Rule 21 of the Commission on Judicial Tenure and Discipline; South Carolina: Rule 34, Items 11 and 33, of the Rules of the Supreme Court; South Dakota: Const., Art. 5, § 9, Comp. Laws Ann. § 16–1A–4 (Supp. 1977), Rule 4 of the Judicial Qualifications Commission; Tennessee: Code Ann. §§ 17–811 (2), 17–813 (2) (Supp. 1977); Texas: Const., Art. 5, § 1⊥-a (10), Rule 19 of Rules for the Removal or Retirement of Judges; Utah: Code Ann. § 78–7–30 (3) (1977); Vermont: Rule 3 of the Rules of the Supreme Court for Disciplinary Control; Virginia: Const., Art. 6, § 10, Code § 2.1–37.13 (1973), Rule 10 of the Judicial Inquiry and Review Commission; West Virginia: Rules 3 and 5 of the Rules of Procedure for the Handling of Complaints Against Justices, Judges, and Magistrates; Wisconsin: Item 21 of the Code of Judicial Ethics, Rules 2 and 3 (4) of the Rules of Procedure of the Judicial Commission; Wyoming: Rule 7 of the Judicial Supervisory Commission.

MR. JUSTICE STEWART, concurring in the judgment.

Virginia has enacted a law making it a criminal offense for "any person" to divulge confidential information about proceedings before its Judicial Inquiry and Review Commission. I cannot agree with the Court that this Virginia law violates the Constitution.

There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary. Virginia's derivative interest in maintaining the confidentiality of the proceedings of its Judicial Inquiry and Review Commission seems equally clear. Only such confidentiality, the State has

determined, will protect upright judges from unjustified harm
and at the same time insure the full and fearless airing in
Commission proceedings of every complaint of judicial mis-
conduct. I find nothing in the Constitution to prevent
Virginia from punishing those who violate this confidentiality.
Cf. *In re Sawyer,* 360 U. S. 622, 646 (opinion concurring in
result).

But in this case Virginia has extended its law to punish a
newspaper, and that it cannot constitutionally do. If the
constitutional protection of a free press means anything, it
means that government cannot take it upon itself to decide
what a newspaper may and may not publish. Though govern-
ment may deny access to information and punish its theft,
government may not prohibit or punish the publication of that
information once it falls into the hands of the press, unless the
need for secrecy is manifestly overwhelming.*

It is on this ground that I concur in the judgment of the
Court.

---

*National defense is the most obvious justification for government
restrictions on publication. Even then, distinctions must be drawn between
prior restraints and subsequent penalties. See, *e. g., New York Times
Co. v. United States,* 403 U. S. 713, 733–737 (WHITE, J., concurring);
*Near v. Minnesota ex rel. Olson,* 283 U. S. 697, 716.