523 A.2d 294

**In the Matter of the JUDICIAL INQUIRY AND REVIEW BOARD, Petitioner,**

v.

**Judge Bernard SNYDER, Respondent.**

Supreme Court of Pennsylvania.

Argued Dec. 2, 1985.

Decided March 20, 1987.

Leonard Schaeffer, Philadelphia, for petitioner.

Richard E. McDevitt, Exec. Director, Judicial Inquiry and Review Board. G. Thomas Miller, Special Counsel for Judicial Inquiry and Review Board, Harrisburg, for respondent.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

HUTCHINSON, Justice.

We have before us three petitions: one filed by the Judicial Inquiry and Review Board (Board) on July 1, 1985, recommending that respondent, Judge Bernard Snyder, be removed from the office of Judge of the Court of Common Pleas of Philadelphia County and two petitions filed by Judge Snyder.[1]

The Board's recommendation is based on its findings: that in the case of *Edgehill v. Municipal Publications, Inc.,* C.P. Philadelphia, May Term, 1972, No. 2371, respon-

1. On September 9, 1985, Judge Snyder filed a request for a Writ of Mandamus against the Judicial Inquiry and Review Board, seeking access to documents in the Board's files. This petition is hereby denied. After receiving two extensions of time from this Court, Judge Snyder filed his Petition to Reject or Modify the Recommendation of the Board on September 11, 1985 as permitted under J.I.R.B. Rule 17. These three petitions all came on for argument under our No. 108 J.I.R.B. Docket 1985, relating to an earlier petition for a Writ of Prohibition filed by Judge Snyder on June 26, 1985. Since that petition has already been denied, we have entered an order amending the caption to reflect the title and docket numbers assigned to the Board's petition. Our disposal of that petition compels denial of Judge Snyder's later petition for mandamus and his application to reject the Board's recommendation. It is so ordered.

dent held frequent *ex parte* conferences with counsel for the plaintiff without informing defense counsel; that these discussions centered on evidentiary and other legal issues involved in this bench trial; that respondent permitted both counsel to engage in unprofessional conduct during the trial, without sanction or disciplinary action; that respondent entered an exceptionally large award of damages for the plaintiff without an evidentiary hearing and based those damages on information obtained outside the record and that respondent presided at a hearing on a motion for his own recusal, acting simultaneously as judge and as witness.[2] These actions caused the Board to conclude that respondent, by violating Canons 1, 2 and 3 of the Code of Judicial Conduct, 455 Pa. xxx (1973), had violated Article V, Section 17(b) of the Pennsylvania Constitution [3] and that the appropriate sanction for such behavior would be removal from the office of Judge.

Observance of these canons by judges is essential to public faith in the justice of our Commonwealth's judicial system. They are positive commands, adopted by this Court, with the force of law. They bind all judges and justices and will be enforced by this Court's imposition of discipline when appropriate. In this case, our *de novo* review of the record persuades us, as ultimate fact finder, that the Board's findings are correct and the recommended discipline of removal appropriate. Respondent has, therefore, forfeited any possibility of holding judicial office in accordance with Article V, Section 18(*l*) of our Pennsylvania Constitution.

Specifically, the Board concluded that Judge Snyder had violated Canon 1 of the Code of Judicial Conduct, which provides:

2. We have already decided that Judge Snyder was disqualified from deciding this recusal motion in *Municipal Publications v. Court of Common Pleas*, 507 Pa. 194, 489 A.2d 1286 (1985).

3. Article V, Section 17(b) provides:
   Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court.

> A Judge Should Uphold the Integrity and Independence of the Judiciary
>
> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should himself observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

455 Pa. at xxx (1973).

The Board concluded that Judge Snyder had "brought discredit to himself and the judiciary in general by the manner in which he presided at the *Edghill* [sic] trial" and the ancillary recusal hearing.[4] Board's Report, Findings of Fact, Conclusions of Law and Recommendations, filed July 1, 1985, (Board's Report), Conclusion of Law No. 14. In this regard the Board explicitly cited Judge Snyder's action in "presiding at the hearing on the recusal motion, knowing that he had been subpoenaed as a witness at that hearing, and thus, that he would be called upon to make evidentiary rulings on objections to his own testimony." *Id.*, Conclusion of Law No. 12.

The Board further concluded that Judge Snyder had violated Canon 2, which provides in pertinent part:

> A Judge Should Avoid Impropriety and the Appearance of Impropriety in All His Activities
>
> A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
>
> B. A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he

---

4. Although the great bulk of the recorded testimony before the Judicial Inquiry and Review Board concerns the Edgehill trial, the record also contains testimony concerning respondent's handling of other cases. *See, e.g.,* Record at 696–699, 757–779, 1186–1239, 1769.

convey or knowingly permit others to convey the impression that they are in a special position to influence him. He should not testify voluntarily as a character witness.

*Commentary:* Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

The testimony of a judge as a character witness injects the prestige of his office into the proceeding in which he testifies and may be misunderstood to be an official testimonial. This Canon, however, does not afford him a privilege against testifying in response to an official summons.

455 Pa. at xxx-xxxi.

Here the Board cited five specific acts which each represented a violation of this Canon: (1) the rendition of a verdict in the *Edgehill* case while a request for his recusal or disqualification from further action in the proceeding remained pending, Board's Report, Conclusion of Law No. 9; (2) the rendition of a verdict in the *Edgehill* case upon learning that defense counsel had requested the assignment of a judge from another county to hear argument on their recusal motion, *Id.* Conclusion of Law No. 11; (3) Judge Snyder's action in presiding over the recusal motion knowing that he would be a witness, *Id.*, Conclusion of Law No. 12, *see* text *supra* at 3; (4) the manifestation of bias in his refusal to admit the testimony of one of his former law clerks on the issue of his bias and partiality at the recusal hearing, *Id.*, Conclusion of Law No. 13, and (5) Judge Snyder's "socializing with the attorney for plaintiff in the *Sentner* case,[5] prior to the entry of a decision in that case," *Id.*, Conclusion of Law No. 15.

5. *Sentner v. William L. Crow Construction Company,* C.P. Philadelphia, March Term, 1977, No. 2232.

Finally, the Board concluded that Judge Snyder had violated the following sections of Canon 3:

A Judge Should Perform the Duties of His Office Impartially and Diligently

The judicial duties of a judge take precedence over all his other activities. His judicial duties include all the duties of his office prescribed by law. In the performance of these duties, the following standards apply:

A. Adjudicative Responsibilities

. . . .

(2) A judge should maintain order and decorum in proceedings before him.

(3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers, and others with whom he deals in his official capacity, and should require similar conduct of lawyers, and of his staff, court officials, and others subject to his direction and control.

*Commentary:* The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court. Courts can be efficient and businesslike while being patient and deliberate.

455 Pa. at xxxi-xxxii.

In support of its conclusion concerning these violations, the Board cited Judge Snyder's failure "to maintain order and decorum during the *Edghill* [sic] trial", Board's Report, Conclusion of Law No. 1, and his failure "to take appropriate disciplinary measures against counsel for both parties for their unprofessional conduct toward each other and the court" during that trial, *Id.*, Conclusion of Law No. 2.

Canon 3 A.(4) provides:

(4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized

by law, must not consider ex parte communications concerning a pending proceeding.

455 Pa. at xxxii.

The Board's conclusion that this subsection had been violated was based on the Judge's entry of a verdict, including an award of punitive damages, in the *Edgehill* case, without reviewing the trial transcript and "without the benefit of *any* record evidence on the issue of punitive damages," Board's Report, Conclusion of Law No. 7 (emphasis in original). This conclusion was also bolstered by the Judge's assessment of punitive damages "without affording counsel the opportunity to present evidence, make argument, and proffer findings of fact and conclusions of law on the question of plaintiff's entitlement to such damages, and the amount of such damages, if any, as [Judge Snyder] had previously agreed he would do," *Id.*, Conclusion of Law No. 8, by his refusal to admit testimony on the issue of his own bias and partiality, *Id.*, Conclusion of Law No. 13, *see* text *supra* at 4, and by his socializing with the attorney for the plaintiff in the *Sentner* case, *supra*, prior to the entry of his decision, *Id.*, Conclusion of Law No. 15, *see* text *supra* at 4. In our judicial system, judges do not enter judgments without a full record or without giving the parties an opportunity to present their arguments on the issues presented by that record. Respondent ignored these basic requirements.

Canon 3 C. addresses the issue of recusal:

C. Disqualification

(1) *A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned,* including but not limited to instances where:

(a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the mat-

ter, or the judge or such lawyer has been a material witness concerning it;

. . . .

(d) *he* or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

. . . .

(iv) *is to the judge's knowledge likely to be a material witness in the proceeding.*

455 Pa. at xxxv-xxxvi (emphasis added).

In support of the Board's conclusions under these subsections, the Board cited: Judge Snyder's failure to disqualify himself in the *Edgehill* recusal hearing in view of the personal bias manifested by his refusal to admit the testimony of a former law clerk, Board's Report, Conclusion of Law No. 13, *see* text *supra* at 4, Judge Snyder's resumption of authority over the *Edgehill* case and his rendition of a verdict upon learning that defense counsel had requested the assignment of a judge from another county to hear argument on their recusal motion, *Id.*, Conclusion of Law No. 11, *see* text *supra* at 4, and his action in "presiding at the hearing on the recusal motion, knowing that he had been subpoenaed as a witness at that hearing, and thus, that he would be called upon to make evidentiary rulings on objections to his own testimony," *Id.*, Conclusion of Law No. 12. *See also Municipal Publications v. Court of Common Pleas*, 507 Pa. 194, 489 A.2d 1286 (1985), *supra* at n. 2. Although *Municipal Publications* was not decided until after respondent's actions in the recusal hearing, our earlier opinions had already indicated that a judge should not and could not continue to preside over his own recusal when he felt his own testimony or explanation was necessary to disposition of the recusal motion. *Commonwealth v. Darush*, 501 Pa. 15, 459 A.2d 727 (1983).[6] In any event,

---

6. *Municipal Publications, supra,* reversed a Superior Court order granting a writ of prohibition precluding respondent from continuing to preside in the *Edgehill* matter. Superior Court's opinion stated that a new judge was required to hear recusal motions in all cases. We

the record, taken as a whole plainly shows bias which should have led respondent to grant recusal. Therefore, reliance on *Crawford's Estate*, 307 Pa. 102, 160 A. 585 (1931), which respondent interprets as in conflict with *Municipal Publications, supra*, would be unavailing if, indeed, a conflict does exist.

This Court heard argument on the Board's Recommendations on December 2, 1985. Since then, we have carefully studied the entire record, including the eighty-five (85) volumes of Notes of Testimony from the *Edgehill* trial, the twenty-eight (28) volumes of Notes of Testimony from the *Edgehill* recusal motion and the nine (9) volumes of Notes of Testimony from the Board's hearings, and deliberated over the issues and the sanctions which are appropriate to this case.

In November of 1985, before we heard argument, the electors in the City of Philadelphia denied Judge Snyder's quest for retention as a Common Pleas judge, thus rendering moot the question of whether this Court should remove him from judicial office. *Curry v. Parkhouse*, 468 Pa. 542, 364 A.2d 326 (1976); *Meyer v. Strouse*, 422 Pa. 136, 221 A.2d 191 (1966). The election results, however, have not ended our responsibility where other issues remain. *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); *Sweeney v. Tucker*, 473 Pa. 493, 375 A.2d 698 (1977). This Court is responsible for maintaining the integrity of judicial administration so as to uphold public respect for the rule of law. Once instituted, our jurisdiction over disciplinary proceedings is thus only at an end when we issue a final order. *Accord In re Hunt*, 308 N.C. 328, 302 S.E.2d 235 (1983); *In re Peoples*, 296 N.C. 109, 250 S.E.2d 890 (1978) *cert. denied*, 442 U.S. 929, 99 S.Ct. 2859, 61 L.Ed.2d 297 (1979).

Article V, Section 18(d) of our Constitution provides that justices and judges "may be suspended, removed from office or *otherwise disciplined* for violation of section 17 of

granted plenary jurisdiction and held, instead, that a judge could not testify and continue to preside in his own recusal.

this article ... or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute...." (emphasis added). The Constitution of Pennsylvania has placed responsibility for judicial discipline in our hands and we cannot avoid the obligation to demonstrate, both to the profession and to the public, that bias and arrogance prejudice the proper administration of justice and bring a judicial office into disrepute. Respondent's conduct can not and will not be tolerated on the bench of any court in Pennsylvania and, while we shall not be hasty in any case, our discipline will assuredly be certain.

■ Article V, Section 18(h) directs: "The Supreme Court shall review the record of the board's proceedings on the law and facts and may permit the introduction of additional evidence. It shall order suspension, removal, discipline or compulsory retirement, or wholly reject the recommendation, as it finds just and proper." Thus, it is plain that this Court has the responsibility for disciplining justices and judges. To discharge that responsibility, we must review *de novo* the record created by the Judicial Inquiry and Review Board and ourselves determine whether it presents clear and convincing evidence of such conduct and, if so, the discipline appropriate.

■ We find the evidence of respondent's derelictions clear and convincing on this record. Taking all of them together, we also find that their cumulative effect is so serious that removal, as recommended by a majority of the Judicial Inquiry and Review Board, would be the only appropriate sanction. Though Judge Snyder has already been removed from office by the voters, it remains for us to impose the judicial sanction which will render the intended operation of Section 18 complete. Otherwise the action of the Judicial Inquiry and Review Board would have no legal effect.

Through Section 18 the people have entrusted to this Court the task of finally determining whether a judge should be disciplined and, if so, the extent of that discipline and its consequences. Those consequences are not neces-

sarily restricted to the term for which the judge has been elected or retained when he engages in improprieties which require discipline. In most cases, when this Court acts to remove sitting justices or judges, the language of Section 18(*l*) [7] itself bars them from further judicial service. In this instance, the electors have removed Judge Snyder from office. It is only this Court, however, which can sanction respondent for his conduct by finding him ineligible hereafter to hold any judicial office. On this record, it is our duty to do so. It is so ordered. The recommendation of the Judicial Inquiry and Review Board is adopted and respondent's petitions are denied.

NIX, C.J., files a concurring opinion in which he joins the majority.

FLAHERTY, J., joins the majority opinion and NIX's, C.J., concurring opinion.

McDERMOTT and PAPADAKOS, JJ., file concurring and dissenting opinions.

NIX, Chief Justice, concurring.

I join the majority opinion. I am constrained to write to respond to some of the questions raised in the concurring and dissenting opinion of Mr. Justice Papadakos.

Under the scheme of Article V, Section 18 of our Constitution, a recommendation of removal by the Judicial Inquiry and Review Board ("Board") requires this Court's action before it has efficacy. In the interim between Board action and this Court's pronouncement, death, resignation or, as in this case, defeat in a retention effort might intervene. Thus the question arises whether the issue is mooted by one of these events. If this Court accepts a recommendation of removal, the effective date is obviously as of the date of the decision of this Court. The Board's power is limited to

---

7. Section 18(*l*) provides:

A justice, judge or justice of the peace ... removed under this section 18 shall forfeit automatically his judicial office and thereafter be ineligible for judicial office.

recommending the sanction it deems appropriate. The final action under Article V, Section 18 is committed to the Court and not the Board for discipline under this Section of our Constitution. This is consistent with the Article's clear mandate to repose in this Court the ultimate responsibility for the management and discipline of the members of the unified judiciary within this Commonwealth.[1] There is no question that the Order entered today speaks from this date.

The real concern raised by the mootness issue is whether any purpose is served by a continuation and completion of the disciplinary process after the jurist in question has left office. As stated by the majority opinion and conceded by the dissent, the jurisdiction of the Court over the disciplinary processes under Article V, Section 18 is not affected by termination of the judicial service during the course of these proceedings. The issue is therefore a question of whether any purpose is to be served by continuing the proceedings to their conclusion. Where the event terminating the jurist's service is death, there is arguably no purpose served by an ultimate finding by this Court.[2] However, where the termination results either from the completion of the term of office, an unsuccessful bid for retention, or a voluntary retirement the question of the former jurist's right to again seek judicial office in this Commonwealth remains unanswered. See Article V, Section 18($l$). It is for this reason that the majority in this matter properly concluded that the issue was not mooted by the unsuccessful retention bid.[3]

1. Article V, Section 18(n) leaves impeachment as an alternative vehicle for the removal of a judicial officer.

2. The issue of the entitlement of the jurist's estate to retirement benefits, in the event of an intervening death, may require a conclusion of the disciplinary process.

3. It must be noted that the failure to be retained does not terminate the service of the jurist, since he or she is allowed to complete the initial term of office. The effect of a retention defeat only precludes the jurist from serving an additional term without a subsequent election or appointment.

The concern of the dissent that this process will cast a cloud upon all of the decisions of the affected judicial officer from the date of the filing of the Board's recommendation is without substance. If that reasoning is followed it could be argued that the decisions rendered by the jurist during the proceedings before the Board would also be suspect. Recognizing the resourcefulness of counsel of this bar, I realize that if we accept that premise it could be cogently argued that from the period Judge Snyder's conduct came into question all of his decisions could be questioned. This is inevitable, but not catastrophic. In each instance an error must be demonstrated before relief would be warranted and such would be the case in any event.

FLAHERTY, J., joins this opinion.

McDERMOTT, Justice, concurring and dissenting.

The removal of a duly elected judicial officer is a matter of the gravest possible concern. The exercise of such power must be rounded at the very least, with all the fundamental protections known to the constitutional jurisprudence of this Commonwealth.

The power to remove by this court or any tribunal, however well founded, constituted, intended or necessary its purpose, by its very nature is capable of compromising the franchise of the people and the independence of the institution it is designed to guard. Both the people and person sought to be removed must precisely know the reasons for the exercise of such power. Those reasons must be grave reasons, based upon facts that constitute misbehavior tantamount to the intentional violation of known precise rules of law, and the proofs must, as for the protection of our other liberties, be beyond a reasonable doubt.

To do less is to put the judicial institution to the possible whim of the tides of the times. Nothing could prove more destructive of that judicial independence so vital to our liberty, than an uncertain or ambiguous standard, changeable at the whim of this Court or the Judicial Inquiry Review Board.

The power to remove and discipline is deposited by the Constitution in this Court. Article 5 § 18 of the Pennsylvania Constitution provides in relevant part:

> any justice or judge may be suspended, removed from office or otherwise disciplined for violation of section seventeen of this article, misconduct in office, neglect of duty, failure to perform his duties, or conduct which prejudices the proper administration of justice or brings the judicial office into disrepute ...

Article 5 § 18(d). Section 17 of the same Article describes the activities from which all judges and justices are prohibited:

> (a) Justices and judges shall devote full time to their judicial duties, and shall not engage in the practice of law, hold office in a political party or political organization, or hold an office or position of profit in the government of the United States, the Commonwealth or any municipal corporation or political subdivision thereof, except in the armed service of the United States or the Commonwealth.
>
> (b) Justices and judges shall not engage in any activity prohibited by law and shall not violate any canon of legal or judicial ethics prescribed by the Supreme Court. Justices of the peace shall be governed by rules or canons which shall be prescribed by the Supreme Court.
>
> (c) No justice, judge or justice of the peace shall be paid or accept for the performance of any judicial duty or for any service connected with his office, any fee, emolument or prerequisite—site other than the salary and expenses provided by law.
>
> (d) No duties shall be imposed by law upon the Supreme Court or any of the justices thereof or the Superior court or any of the judges thereof, except such as are judicial, nor shall any of them exercise any power of appointment except as provided in this Constitution.

Art. 5 § 17.

Although the Constitution lays out the reasons upon which this Court may act, it does not set forth what

standards are to be utilized in determining when its injunctions have been violated. The majority opinion does little if anything to rectify that situation. Instead the majority, without apparent disquietude, lumps all types of discipline together, and enunciates an ambiguous burden of proof.

There can be no question but that whatever standards may be delineated, they must comport with the traditional constitutional requirements of due process. Neither this Court, nor any tribunal can, within that tradition, set standards of procedure that would render elected officials, judicial or otherwise, at the mercy of whim, or small reason.

Under our state Constitution there are only two ways in which a judicial officer can be removed. The first is by the procedure at hand, where the Judicial Inquiry and Review Board, after a hearing, recommends removal and this Court accepts that recommendation. The second is by impeachment. *See* Article 6 § 6. A comparison of two methods clearly demonstrates that there are significant safeguards in the latter method, not the least of which is the ability to confront the body which is ultimately passing judgment, and the fact that the Senate must arrive at a decision by a two thirds-majority.

I cannot believe that the Constitution intended to allow more relaxed standards to be applied by this Court. This Court could not maintain its jurisprudential integrity if it fails to protect, in any context, the basic rights of an accused, and in these instances, the corollary right of the people to those they elect.

Because of the uniqueness of the penalty of removal I would require more safeguards than the majority accords. Firstly, prior to concluding that the activities of a given judge or justice warranted *removal,* I would require that the allegations be proven beyond a reasonable doubt. Secondly, absent a criminal conviction, I would require that prior to removal this Court exercise its constitutional power to receive evidence, Article 5 § 18(h), and at a minimum,

allow the judge or justice in question an audience before this Court.[1]

Since the other sanctions described in Article 5 § 18 are lesser, and more in the nature of disciplining members of the judiciary, with an eye towards improving their performance and the overall performance of the judiciary, I would accept lesser safeguards, and would accept that clear and convincing evidence, as determined by the Judicial Inquiry and Review Board and this Court, would suffice as a basis for the imposition of such discipline.

After completely reviewing the testimony I can conclude and do, under a standard of clear and convincing evidence, Judge Snyder must be disciplined. I am, however, not satisfied beyond a reasonable doubt that removal, the capital penalty, is justified without a finding of personal dishonesty or conviction of an infamous crime.

There is no doubt that Judge Snyder gave serious cause for the "appearance" of impropriety. We may discipline for the "appearance", but without the substance of dishonest impropriety, "appearance" should not of itself be grounds for removal. That is not to say that willful, intentional "appearances", or refusal to correct "appearances" may not suffice; it is to say that our law does not convict for appearance or mere presence alone.

It may well be that the evidence offered in this grim spectacle would meet any standard, but that standard should be stated with clarity and be the canon under which all the evidence is scrutinized.

Accordingly, I would enter an order of suspension as the appropriate discipline.

PAPADAKOS, Justice, concurring and dissenting.

I am compelled to dissent because I believe that the Majority Opinion in this case is incorrect in its application of the law.

1. If we are not willing to exercise this power in imposing the most serious sanction possible we are effectively denigrating the constitutional grant of such power to such an extent as to render it nugatory.

The initial problem posed by this case is the fact that because the Respondent is no longer in office as of the date of this decision today, our jurisdiction over these disciplinary proceedings may be susceptible to attack. In order to dispel any confusion over this issue, I wish to underscore at the outset the fact that this Court possesses continuing and plenary jurisdiction which cannot be foreclosed prior to our final decision in a case. Our authority to conduct judicial proceedings and impose punishment, moreover, flows directly from our State Constitution.[1] It does not depend, as the Majority argues, on the authority of cases from either sister states or other decisions which, in any event, are distinguishable on the facts. There is no need, therefore, to reach beyond our own Constitution to find a basis of continuing jurisdiction. In sum, this tribunal continues to have constitutional jurisdiction inspite of any intervening acts which result in a judge leaving office. Once the discretionary punishment of removal is selected by this Court as appropriate under the facts of a case, of course, perpetual banishment under Article 5, Section 18(e), results automatically by operation of the Constitution.

Because of these arguments, the Majority decision is badly flawed in two other respects. On the one hand, I presume that it is the intent of the Majority to fix the date of removal from office as some date prior to the natural termination of Respondent's term, while he was still in office.[2] In that case, it is obvious that the Respondent's

---

1. Article 5, Section 1; Article 5, Section 10(a). In addition, this Court is imbued with inherent supervisory and administrative power over the inferior courts and judicial officers. *In re Franciscus,* 471 Pa. 53, 369 A.2d 1190 (1977), *cert. denied,* 434 U.S. 870, 98 S.Ct. 212, 54 L.Ed.2d 148 (1977); *Carpentertown Coal and Coke Co. v. Laird,* 360 Pa. 94, 61 A.2d 426 (1948).

2. In his concurring opinion, Chief Justice Nix expresses a view that "If this Court accepts a recommendation of removal, the effective date is obviously as of the date of the decision of this Court," (p. 153–155) and "There is no question that the Order entered today speaks from this date." (p. 153–155). I am mindful that wills speak as of the date of death. Not Orders of Court which can be effective some specific date in the past (nunc pro tunc orders), the date of entry, or some specific date in the future.

judicial decisions taken subsequent to that date of removal may linger under a pall of suspicion regarding their validity. This could easily result in additional damage to judicial integrity through collateral attacks. Of course, we are empowered fully to set any removal date, but the consequences of our choice should not result in foolishness.

On the other hand, the Majority compounds its own problems even further by interpreting Respondent's retention election loss as a removal from office. The truth, on the contrary, is that following Respondent's rejection at the polls, he completed his full term, was not *removed* during his tenure, and is fully eligible to run in the future in a contested election, unless and until this Court imposes the punishment of removal from office. The loss of a retention election cannot be equated with *removal* from office in any case. Under the Majority's definition, that would mean that all losers of retention elections could be considered as being *removed* from office by the electorate, and arguably subject to the same type of sanction. Is this the intent of the Majority's argument? The electors of Philadelphia County chose not to *return* Respondent to office; they did not *remove* Respondent from office.

In place of futile and confusing efforts to find a date of removal in some past act, the Majority opinion would have been more consistent and jurisdictionally accurate had it simply stated that its decision to remove Respondent from office was legally effective as of a date, nunc pro tunc, while Respondent occupied the office. In that fashion, this Court then could decide that its jurisdiction over the disciplinary proceeding was continuing and not at an end until the date of the final order *regardless* of any intervening election, or resignation, or even death. This would have resolved the conundrum of the validity of Respondent's subsequent decisions and rendered irrelevant the vexatious issue of the retention election loss.

> If the Majority is of the same view as Chief Justice Nix that the removal of Judge Snyder is effective the date of the decision of this Court, I am then at a loss to understand how we can, today, remove a person from an office he no longer occupies.

Because I am convinced that this Court possesses such undisputed authority to retain jurisdiction, I find no merit in the Majority's inconsistencies on the subject of removal. A gap will always exist between the actions of the Board and a final order issued by this Court. Judges will continue to hold office and hand down decisions during this period, and the very problems addressed by this case will be re-created in the future.

In the context of the present case, this Court should decide that its final order is the last legal step which divests the judge of authority, even though such order may act in a nunc pro tunc fashion. As for future cases, I strongly recommend the use of our recently adopted administrative solution[3] in the form of a temporary suspension with pay, imposed by this Court, to take effect on the date we select. The errant judge would be prevented thereby from sitting on the bench pending a final order by this tribunal.

It is beyond dispute that Respondent committed egregious errors of judicial behavior in violation of the Pennsylvania Constitution and the Code of Judicial Conduct. It is equally clear that appropriate discipline is necessary in order to provide adequate assurances to the public that judicial misbehavior is, in fact, being dealt with in a firm manner. Where a member of the Pennsylvania Judiciary has been derelict in the performance of positive duties, there can be no alternative to the application of proper sanctions in order to protect the integrity of the courts and the rule of law. As Mr. Justice Stewart wrote in *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 848, 98 S.Ct. 1535, 1546, 56 L.Ed.2d 1 (1977), "There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary." This Court, as well, has diligently reaffirmed its intention not to be remiss in its administrative duties regarding the inferior courts. *In re Franciscus,* 471 Pa. 53, 369 A.2d 1190 (1977), *cert. denied,* 434 U.S. 870, 98 S.Ct. 212, 54 L.Ed.2d 148 (1977).

3. Rule 24, No. 113 JIRB Docket, eff. 12/5/86.

Like my brethren, I, too, have labored long and hard faced with a labyrinthian transcript which intermingles fact with fiction, reality with phantasma, and innuendos with credible evidence. This is a war story replete with gory details of lawyers often conducting themselves in a hateful, vengeful, and deceitful manner. I find a judge who genuinely agonized over the spectacle taking place before him, finally succumbing to the bludgeoning grip of human passion by violating the sworn duty and honor of his office. I find a judge who allowed himself to be stampeded into thoughtless reaction by presiding over litigation in which he had fatefully implicated himself as a witness, and then entered an illegal verdict as well. Finally, I am not unmindful of the severe chastisement this judge has received in public fora. This is a judge who, up to this point, possessed a distinguished record of judicial service to the citizens of this Commonwealth.

I know that we have given serious consideration to the other side of the rule of judicial integrity. For while we are charged to protect the public's confidence in the honesty of the judicial process, we must not blind ourselves to the fact that such integrity also derives from a "just and proper" treatment of those who man the judicial ramparts. They, too, have a right to expect balanced punishment even when they fail as dramaticaly as has the Respondent in this case. Integrity in the law comes from many sources, including the knowledge of our sitting judges that their long and competent labors in the vineyard will not be *totally* sacrificed when they fall.

Under the aggregate facts of this case, I see a judge who used his judicial power in a vengeful manner. By his own conduct he has plunged himself into the depths of judicial oblivion. Despite his prior unblemished record on the bench, and his unassailable reputation as a practicing member of the bar, both of which should receive great weight as we ponder his fate, we are obliged to consider the abuse of raw judicial power exercised by Respondent which will spawn inexorable complexities in the future.

For these reasons, the law and my conscience leave me no alternative but to concur in the result reached by the majority and order Respondent's removal from office. I would make such removal effective as of December 30, 1985.