ESTATE OF MARTIN LUTHER KING, JR., INC. Plaintiff,

v.

CBS, INC., Defendant.

No. CIV.1:96–CV–3052–WCO.

United States District Court,
N.D. Georgia,
Atlanta Division.

Feb. 15, 2002.

Joseph M. Beck, Kilpatrick Stockton LLP, Atlanta, GA, for Plaintiff.

James A. Washburn, Long, Aldridge & Norman LLP, Atlanta, GA, Landis C. Best, Cahill, Gordon & Reindel, New York City, for Defendant.

## ORDER

O'KELLEY, Senior District Judge.

This case is presently before the court for consideration of the parties' joint response [75–1] to this court's show cause order of February 15, 2001 [74–1]. In said order, the court directed the parties to show cause why certain discovery materials, filed under seal in support of the parties' respective motions for summary judgment [32–1; 34–1], should not be unsealed and made part of the public record.

## I. Factual Background

### A. The Underlying Litigation

The instant dispute arises out of a copyright infringement action filed by plaintiff, the Estate of Dr. Martin Luther King, Jr. ("the Estate"), against defendant, CBS, Inc. ("CBS"), on November 19, 1996[1–1]. Pursuant to a 1994 contract with the Arts & Entertainment Network ("A & E"), CBS produced a historical documentary series entitled "The 20th Century With Mike Wallace," which featured, as part of a segment covering Dr. Martin Luther King and the "March on Washington," video footage of Dr. King's famous "I Have a Dream" speech delivered from the Lincoln Memorial in Washington, D.C. on August 28, 1963. Thereafter, A & E broadcast the series and sold the videotapes as a box set. The ultimate resolution of the case depended upon whether Dr. King's public delivery of the speech to millions of spectators and television viewers constituted a "general publication" so as to place it in the public domain or whether the Estate retained a proprietary interest in the speech under the common law, such that CBS had infringed upon a valid copyright. Notably, the litigation drew widespread media attention and sparked scholarly debate throughout the nation.[1]

### B. Relevant Procedural History

Several months after discovery commenced, the parties stipulated to a protective order governing the production and filing of purportedly confidential or sensitive discovery materials, which this court approved with minor modifications on July 10, 1997 [18–1]. Specifically, the order permitted the parties or any witnesses to designate any document or other material produced as "confidential," thus restricting the dissemination and use of such materials to the instant litigation [Stipulated Protective Order Re: Confidentiality ("Protective Order") ¶¶ 1–5]. With respect to documents actually submitted to the court in connection with pleadings or motions, as distinguished from documents merely exchanged by the parties, the order provided:

> Information and documents subject to this Protective Order shall not be filed with the Court or included in whole or in part in pleadings, motions, briefs, and other documents filed in this action, except when filed under seal and marked as follows: CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER. Sealed pleadings, motions, briefs, and other documents shall be opened only by the Court or its authorized personnel.

[Protective Order ¶ 2]. Finally, the order established that at the conclusion of the case, "each party shall return to counsel for the other party or witness any materials designated as 'Confidential' pursuant to this Protective Order" [Protective Order ¶ 9].

On October 30, 1997, the parties filed cross-motions for summary judgment [32–1; 34–1] and, pursuant to the protective order, the Estate filed under seal approxi-

---

1. *See, e.g., Public Owns King Speech,* National Law Journal, Aug. 3, 1998, at A10; Emily Heller, *Now Everybody has King's 'Dream' Speech,* Fulton County Daily Report (Atlanta), July 24, 1998; *Legal Briefs,* Hollywood Reporter (Los Angeles), July 24, 1998; David Stout, *'Dream' Speech By King Is Held As the Public's,* N.Y. Times, July 23, 1998, at A12; Ann Woolner, *Who Owns the Dream?,* The Recorder (San Francisco), March 4, 1998, at 4; Ann Woolner, *Copyright Protection of the Works of Martin Luther King Jr. Limits the Writing of History,* Legal Times (Washington), Jan. 13, 1997, at 23; *King Estate Sues CBS Over Copyright,* L.A. Times, Nov. 20, 1996, at 3; Larry D. Hatfield, *Martin Luther King Estate Sues CBS Over "I Have a Dream" Speech; Network Selling Videos of Address,* S.F. Examiner, Nov. 21, 1996, at C18; Hollis R. Towns, *King Estate Sues CBS Over Use of 'Dream' Speech in Videotape,* Atlanta Journal & Const., Nov. 20, 1996.

mately 40 exhibits in support of its motion for summary judgment [37–1; 54–1]. These exhibits include:

1. brief in support of the Estate's motion for summary judgment [35–1];

2. correspondence between CBS and Richard Kaplan Productions concerning the use of civil rights footage in an "Our Times With Bill Moyers" segment entitled "King: A Film Record; Montgomery to Memphis" (stamped CBS 2584–2588);

3. licensing agreements between CBS and various foreign broadcasting companies (stamped CBS 1–89);

4. April 7, 1994 consent judgment entered against Gannett Company, Inc. ("USA Today") in the United States District Court for the Northern District of Georgia, recognizing copyright ownership of the "I Have a Dream" speech. *See Dexter King et al. v. Gannett Company, Inc.*, No. 93–CV–2819–JEC (N.D.Ga.1994) (stamped MLK 000235–236);

5. four text versions of the "I Have a Dream" speech: (1) as delivered on August 28, 1963; (2) advance text; (3) comparison between "advance text" and "as delivered" versions; and (4) portion used in A & E documentary;

6. deposition testimony from 17 witnesses, including Dexter Scott King and past and present CBS employees;

7. licensing agreements and related correspondence between the Estate and various licensees regarding use of the "I have a Dream" speech and other intellectual property (stamped MLK 13–15; 24; 1013–15; 1019; 1022–25; 1075–78; 1082–84; 1093–96; 1107–11; 1135–61; 1189–92; 1223–26; 1286–89; 1304–17; 1296–99; 1318–42; 1365–1408; 1446; 1456; 1706–11; 1773–77; 1850; 1883–86; 1932–34; 1988–92; 2199–2203; 2287–89; 2767–72);

8. licensing agreement and related correspondence between CBS and A & E concerning the series (stamped CBS 7–15; 971–73; 2581);

9. internal CBS memorandum and invoices concerning the series (stamped CBS 115; 143–144);

10. CBS licensing agreements and related correspondence, including a licensing agreement between CBS and the Estate concerning the use of the "I Have a Dream" speech in the "Random Acts" episode of "Touched By An Angel" (stamped CBS 2581–82; 2589; 2824; 3204–08; 3210);

11. CBS revenue figures respecting the series;

12. Robert Frost, "The Gift Outright," excerpted from *Complete Poems of Robert Frost* (Holt, Reinhart & Winston, 1967);

13. television frames of credits run after "Our Times With Bill Moyers" segment that had incorporated portion of the "I Have a Dream" speech;

14. six relevant press releases and newspaper articles; and

15. seven documents filed in the United States District Court for the Southern District of New York in connection with a 1963 copyright suit initiated by Dr. King (obtained from the National Archives and Records Administration). *See King v. Mister Maestro, Inc.*, 224 F.Supp. 101 (S.D.N.Y.1963).

Further, the Estate filed 14 depositions under seal, including exhibits thereto, in support of its motion for summary judgment. The exhibits, which include a wide variety of CBS letters and invoices, internal memoranda, revenue projections, and scripts produced during discovery, were carefully tucked behind the back flap of each bound deposition transcript, which

were filed with the court in 14 individually sealed envelopes bearing the "Confidential Pursuant to Protective Order" stamp. Two of these depositions were accompanied by purportedly confidential excerpts, separately bound and labeled "CONFIDENTIAL PORTION OF THE DEPOSITION of Jaan Vaino" and "CONFIDENTIAL PORTION OF THE DEPOSITION of Josie Thomas," respectively. The "confidential" testimony excerpted from both depositions disclosed the compensation Mike Wallace received from CBS for his role in the A & E documentary series.

Meanwhile, CBS filed two "confidential" discovery documents in support of its motion for summary judgment: (1) the August 5, 1997 deposition of Dexter Scott King, Chairman, President, and Chief Executive Officer of the Martin Luther King, Jr. Center for Nonviolent Social Change and Chief Executive Officer of the Estate; and (2) the August 7, 1997 deposition of Phillip Jones, General Manager of the Estate and Chairman of Intellectual Properties Management ("IPM"), the corporation that administers the Estate's intellectual property. CBS filed both depositions along with an October 30, 1997 notice of filing of original discovery [33–1]. Although neither the notice nor the envelopes that contained the depositions bore the "Confidential Pursuant to Protective Order" stamp, the front cover of each deposition was stamped "CONFIDENTIAL" in red ink.

After extensive review and consideration of the parties' motions and accompanying exhibits, this court entered summary judgment in favor of CBS on July 22, 1998 [63–1]. *See Estate of Martin Luther King, Jr., Inc. v. CBS, Inc.,* 13 F.Supp.2d 1347 (N.D.Ga.1998). The Estate petitioned for appellate review of the ruling, which the United States Court of Appeals for the Eleventh Circuit subsequently reversed by order of November 5, 1999 [69–1]. *See Estate of Martin Luther King, Jr., Inc. v.*

*CBS, Inc.,* 194 F.3d 1211 (11th Cir.1999). Thereafter, the parties entered into settlement negotiations and stipulated to the dismissal of plaintiff's action with prejudice on July 12, 2000 [73–1].

## C. District Court Records Disposition Procedures

In accordance with the local rules of this court, which provide that "closed files ... are forwarded to the Federal Records Center ["FRC"] for this district," *see* LR 79.1(I), NDGa., and the records disposition procedures promulgated by the Administrative Office of the United States Courts, *see* Administrative Office of the United States Courts, *Guide to Judiciary Policies & Procedures,* Vol. XIII, Ch. XVII (2001) ("*Records Management Policies*"), the court records officer subsequently classified the instant case files as "temporary" and initiated their transfer to the legal custody of the East Point, Georgia FRC, where they would be retained until their destruction in May of 2021. *See Records Management Policies* A.5(A); A.6(D); 36 C.F.R. § 1228.30 (2001). The clerk made this designation pursuant to "Records Disposition Schedule 2," governing the United States District Courts, which provides that all civil case files dated 1970 or later that (1) did not terminate during or after a trial; and (2) do not have historical value, shall be "dispos[ed][of] 20 years after transfer to a FRC." *Id.* at A.15(A)(7)(b).

Nevertheless, sealed records cannot be interfiled with and transferred to FRCs along with case files designated as "temporary." Boxes containing sealed records must be separately "taped shut and marked 'sealed records,'" with "instructions limiting access solely to court personnel." *Id.* at A.6(J). Therefore, although he immediately transferred the closed case files to the legal custody of the local FRC, the court records officer separately re-

tained the sealed materials at issue in order to appropriately package, identify, and transfer them at a later date.

Prior to doing so, however, as part of a periodic review of the district court archives, the court records officer reminded the court of the existence of the sealed records and requested permission to unseal them, pursuant to part A.6(J) of the records disposition manual. *See id.* (advising the court records officer to "vacate seals ... to coincide with [the] normal cycle for transferring other records to FRCs," and encouraging the court itself "to review and consider unsealing older bodies of sealed material ... and set a presumptive time-frame after a record has been sealed when it may be unsealed, with the burden on the litigants to establish why the seal should be maintained."). To address the court records officer's request, the court thus issued the instant show cause order on February 15, 2001 [74–1].

### D.  The Instant Litigation

In its February 15th order, the court directed the parties to show cause why the purportedly confidential discovery materials filed in support of their respective summary judgment motions should not now be unsealed, transferred to the custody of the FRC, and ultimately made part of the public record. The parties filed a joint response on March 5, 2001, contesting the potential unsealing on grounds that "the information filed under seal contain[ed] trade secrets and other confidential information" [Joint Response ¶ 1]. Further, the parties asserted that they were "prepared to accept and reclaim all sealed materials ... from the Clerk" [Joint Response ¶ 1]. To facilitate the resolution of the unsealing

issue, this court set the matter for a hearing on October 1, 2001 [77–1].

At said hearing, the court expressed its inclination to unseal the materials at issue yet offered the parties an additional 10–day period in which to file briefs before entering an order. CBS promptly withdrew its response to the court's show cause order, asserting that CBS would not oppose the unsealing of any document filed with the court that was previously designated as confidential.[2] The Estate, however, reiterated its opposition to the potential unsealing, indicating that it would promptly notify the court if its position changed. Though the Estate filed no responsive pleading during the 10–day period, it requested a second hearing to resolve the matter. The court granted said request, once again setting the matter for a hearing.

### E.  The October 22, 2001 Hearing

At the second hearing, held in chambers on October 22, 2001 [78–1], the Estate withdrew its opposition to the unsealing of any document filed in support of its own motion for summary judgment.[3] However, the Estate requested that the depositions of Dexter Scott King and Phillip Jones, filed by CBS in connection with CBS' motion for summary judgment, remain under seal.

According to the Estate, in these depositions CBS had elicited testimony about a 1996 book contract between the Estate, IPM, and Time Warner, Inc., a contract having little or no relevance to the underlying copyright dispute. Having initially objected to CBS' questions concerning the contract [King Dep. at. 54:13–22, 56:19–

---

2.  CBS confirmed its position in a letter to the court dated October 3, 2001 [Letter from James A. Washburn, Long, Aldridge & Norman LLP, to Judge William C. O'Kelley (Oct. 3, 2001) (on file with the court) ].

3.  Having withdrawn any opposition to the unsealing of the confidential discovery materials, CBS made no appearance at the October 22, 2001 hearing.

57:21], the Estate claims it eventually allowed the witnesses to testify on the subject, thus disclosing confidential and/or potentially embarrassing information and trade secrets. Yet, according to the Estate, it acceded to CBS' objectionable line of questioning only in reliance on (1) the protective order between the parties; and (2) an understanding that the two depositions would be designated by CBS as confidential [King Dep. at 59:13–18; Jones Dep. at 37:1–10]. Further, the Estate claims that it allowed the testimony to proceed in the interests of cooperation and efficiency [King Dep. at 64:15–18; Jones Dep. at 37:1–10], given that CBS' continued questioning, and the Estate's objections thereto, were inhibiting the flow of the depositions. Notably, the deposition of Dexter Scott King includes the following exchange among King (the witness), Joseph M. Beck (counsel to the Estate), and Floyd Abrams (counsel to CBS):

THE WITNESS ... my concern has more to do ... with confidentiality. And I know that even with the best intentions, things will leak out.

. . . . .

What type of guarantee or indemnification can we receive that if this leaks out we will be protected and indemnified by CBS and/or its appropriate parties?

. . . . .

MR. ABRAMS: Counsel have reached an agreement as to certain confidential treatment of documents and information in this case. The agreement is complete in itself ... it does not contain any indemnification provision ... if you think this so intrudes into your privacy ... that's something you may want to take up with the Court.

. . . . .

MR. BECK ... We're being asked to provide the most sensitive information

... which as everyone knows, leaks. And so we have a special sensitivity ...

. . . . .

MR. ABRAMS ... the fact is to the extent CBS takes on an obligation of confidentiality, it will adhere to the obligation of confidentiality. If that does not satisfy Mr. King, and Mr. King thinks that this is the sort of thing we ought to litigate in front of a judge, we'll do it.

[King Dep. at 65:3–68:10].

On these grounds, the Estate thus renewed its earlier request that the subject testimony remain under seal. The Estate further argued that the testimony should remain under seal because (1) the presumption in favor of confidentiality outweighed any public interest in the two depositions, given the complete lack of media interest in them; (2) the presumption in favor of confidentiality could not be defeated by any significant public interest in the depositions, such as public safety or consumer protection; (3) the right of public access to court documents must be construed in a manner consistent with the liberality of pre-trial discovery and the goal of encouraging settlements; and (4) the Estate could not be charged with introducing the testimony into the public record by filing it in connection with a dispositive motion, for it was CBS, not the Estate, who filed the purportedly sensitive materials in connection with CBS' own motion for summary judgment.

At the conclusion of the October 22nd hearing, the court observed that the two depositions at issue were not among the sealed materials provided to the court by the court records officer for consideration of the show cause order. As such, the court suggested to the Estate that the two depositions might have been mistakenly interfiled with the materials already sent to the FRC, thus making them part of the

public record and mooting the issue at hand. The Estate nonetheless argued that if such a mistake had been made, the depositions at issue should be promptly removed from the public record and properly placed under seal pursuant to the protective order.

### F. Subsequent Developments

#### 1. Location of the Depositions at Issue

Following the retrieval of the closed case files from the FRC, the court was able to determine, as suspected, that the depositions at issue had already been interfiled with those materials and transferred to the local FRC. Further, the court observed that the two depositions at issue had never been filed under seal as promised. Specifically, neither CBS' notice of filing of original discovery [33–1] nor the envelopes in which the depositions were contained bore the requisite "Confidential Pursuant to Protective Order" designation. Although the front cover of each deposition had been stamped "confidential," the court was unable to identify anything in the file that would have communicated to the district court clerk's office that the depositions should have been filed under seal.

Although the court has no way of knowing whether any member of the public reviewed the two depositions at issue while they were in the custody of the district court clerk's office, as part of the court's public file, the FRC "Reference Request Form" accompanying the files indicates that no one reviewed them while they were in the custody of the local FRC. As a result, it is unclear whether the confidentiality of the deposition testimony at issue has been preserved despite (1) its presence in the court's public file; and (2) its subsequent transfer to a public storage facility.

#### 2. Reappraisal of the Instant Federal Records

In an effort to clarify its understanding of the district court records disposition procedures, the court met in chambers with the court records officer on November 13, 2001. At this meeting, the court records officer discussed the procedures governing closed case files, as well as the maintenance, transfer, and storage of sealed records, and he reiterated that the instant case files had been classified as temporary records set for destruction in May of 2021. However, noting the novel copyright issues addressed in the underlying litigation between the Estate and CBS, the widespread media attention it received, and the overall importance of Dr. King and the "I Have a Dream" speech in the grand scheme of American history, the court opined that the instant case files warranted permanent historical preservation by the National Archives and Records Administration ("NARA"). After consulting with NARA officials, the court records officer thus reclassified the instant case files as "permanent," meaning that said records had "sufficient historical or other value to warrant permanent retention," and arranged for their transfer to the legal custody of NARA. *Records Management Policies* A.2; A.6(B); *see also* 36 C.F.R. §§ 1228.28, 1228.262(a) (2001).

This reappraisal served to exacerbate, rather than resolve, the sealed records problem. Unlike temporary sealed records, which may be transferred to FRCs and retained until their eventual destruction, permanent sealed case files cannot be transferred to NARA unless they include a date upon which the seal may be vacated. *Id.* at A.6(J). Thus, such files must remain on-site, in a virtual document purgatory, consuming valuable court storage space.

## II. Discussion

This case is illustrative of the administrative headache caused by litigants who stipulate to blanket protective orders, arbitrarily file boxes of documents under seal, and then contest their unsealing at the conclusion of the litigation. As such, an investigation into the federal judiciary's document management and disposition procedures is warranted. By exploring this otherwise hidden component of the judicial process, the court hopes to provide guidance to litigants, records administrators, and judges, alleviate the court's document management burdens, and unclog precious storage resources.

### A. Relevant Records Disposition Procedures

The Administrative Office of the United States Courts promulgated the aforementioned *Records Management Policies* pursuant to the National Archives and Records Administration Act of 1984, 44 U.S.C. §§ 2101 *et seq.* (2001), which established NARA as an independent agency within the executive branch of the federal government, supervised by a presidentially-appointed "archivist," to administer, dispose of, and if necessary, prepare for public access, the records of all agencies and branches of the federal government. *See* 44 U.S.C. § 2102 (2001); 36 C.F.R. § 1220.2 (2001). In order to direct the "[j]udicious preservation and disposal of records," 44 U.S.C. § 2902(5) (2001), the congressional edict further authorized the archivist to "prescribe such regulations as the Archivist deems necessary to effectu-

ate" NARA's functions. 44 U.S.C. § 2104(a) (2001); *see also* 44 U.S.C. § 3302 (2001).

In this vein, the *Records Management Policies* provide judicial staff with extensive guidance to ensure

(A) The preservation of records of permanent value;

(B) The appropriate disposition of other records as soon as they have served the purposes for which they were created; and

(C) The removal of records from office space to less expensive storage facilities, thereby reducing records maintenance costs and creating more available local storage and filing space.

*Records Management Policies* A.1. To determine the fate of closed civil case files, the district court records officer must engage in a multi-step inquiry. First, the closed files must be classified as either "permanent" or "temporary" to determine whether, or for how long, the government will preserve them. 36 C.F.R. §§ 1228.28, 1228.30 (2001). Civil case files qualifying for "permanent" retention include (1) cases since 1970 that have ended during or after a trial; (2) cases dated 1969 or earlier; or (3) cases determined by NARA, in consultation with court officials, to have historical value.[4] *Id.* at A.15(A)(7). Any civil case file that fails to fulfill at least one of these requirements must be classified as "temporary" and destroyed 20 years after being transferred to an FRC. *See id.* Permanent records, on the other hand, may never be destroyed. Rather, after being

---

**4.** The *Records Management Policies* provide that "individual cases which are significant on their own merits may ... be selected for permanent retention by NARA on the advice of judges, clerks of court, probation officers, lawyers, historians, or others." *Id.* at A.7(F). Moreover, cases that have already been deemed "temporary" and transferred to an FRC "may be recommended by a court for

permanent retention by letter ... to the FRC director at any time ... [and thereby] removed from the disposable files and placed in the Archives by FRC personnel." *Id.* at A.10(C); *see also* 36 C.F.R. § 1228.30 (2001) ("NARA may determine that records proposed as temporary merit permanent retention and transfer to the National Archives.").

transferred to an FRC, these records are permanently archived and preserved by NARA.

Within this framework, sealed case files present special problems. First, as noted, the document disposition procedures prohibit the transfer of permanent sealed case files to NARA, unless such files include a date upon which the seal may be vacated. Second, even if sealed case files relate to "temporary," rather than "permanent," records or relate to permanent records that include an unsealing date, they cannot be interfiled with or transferred to NARA or an FRC along with unsealed files. Instead, as noted, boxes containing sealed records must be separately "taped shut and marked 'sealed records,'" with "instructions limiting access solely to court personnel." *Id.* at A.6(J). Third, "[w]henever court personnel retrieve sealed records from an FRC they must be returned to the FRC in a new, sealed box." *Id.* Finally, the court records officer must ensure that at all times prior to their transfer to an FRC, sealed records are "maintained separately from other records in a secure area at the court location." *Id.*

Whether relating to temporary records or permanent records, therefore, sealed records consume valuable on-site storage space and draw upon finite judicial resources and time. Further, it has been this court's experience that such records seem to constantly re-appear, requiring judicial attention years after the underlying litigation has long since been forgotten. These problems are particularly agonizing in cases such as this one. Here, the underlying litigation was resolved more than one year ago. Further, given the passage of over five years since the litigation commenced, the purportedly confidential information contained in the parties' summary judgment exhibits arguably no longer has value as confidential business information. Yet, in response to the instant show cause order, both parties instinctively opposed unsealing the materials, apparently without even reviewing them. Later, CBS withdrew its opposition entirely; presumably, it came to the realization that its sealed documents were now innocuous. Meanwhile the Estate modified its opposition; yet, the only two documents it wished to remain sealed had, in fact, never been sealed. Therefore, neither the Estate nor CBS actually had a genuine interest in preserving the confidentiality of the one and a half foot stack of sealed materials at issue.[5]

█ There are two simple solutions to the sealed records problem. First, before arbitrarily filing documents under seal, litigants must guard against needlessly drawing upon judicial resources and should be mindful of the administrative quagmire through which court records officers must wade in managing such records. Second, and more importantly, courts should no longer permit parties to stipulate to protective orders, and freely file documents under seal, without first specifying a date upon which the seal may be vacated. *See id.* This way, even if the court sets the expiration date at 10 or 20 years into the future, such records, if deemed permanent, need not be retained on-site long after the underlying litigation has ceased. Further, such a measure would decrease the amount of time and energy judges expend reviewing, issuing show cause orders, and addressing the unsealing of closed case files, some of which may have been sealed by a judge no longer on the bench. *See id.*

## III. The Estate's Opposition to the Instant Show Cause Order

Unfortunately, the preceding discussion fails to resolve the ultimate issue in this

---

5. For purposes of obtaining an accurate measurement, the court included the parties' sealed duplicate records, as well as their sealed originals.

case: the Estate's opposition to the potential unsealing of the Dexter Scott King and Phillip Jones depositions. This matter raises interesting legal wrinkles, in that no third party media representative or member of the public is actively seeking access to the depositions and the depositions were submitted to the court not by the Estate, the proponent of the seal, but by CBS, its adversary. Further, the two depositions were, as it turns out, never actually filed under seal; they have arguably already been made part of the public record. Finally, in its response to the court's February 15th show cause order, and in the two subsequent hearings, the Estate requested permission to reclaim custody of the purportedly confidential discovery materials from the court as an alternative to sealing or unsealing them.

## A. Preliminary Matters

### 1. Scope of the District Court's Authority to Seal Records

The federal district courts derive their authority to seal or otherwise deny public access to documents or proceedings from Rule 26(c) of the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 26(c). Rule 26(c) provides, in relevant part:

PROTECTIVE ORDERS. Upon motion by a party or by the person from whom discovery is sought ... and for *good cause* shown, the court in which the action is pending ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

. . . . .

(6) that a deposition, after being sealed, be opened only by order of the court;
(7) that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way; and

(8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

Fed.R.Civ.P. 26(c) (emphasis added). The Eleventh Circuit recently opined that, as in the instant case, it "has become commonplace ... [for] parties [to] stipulate to ... protective order[s] allowing each other to designate particular documents as confidential and subject to protection" pursuant to Rule 26(c)(7), a tool that has "replac[ed] the need to litigate the claim to protection document by document ...." *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.,* 263 F.3d 1304, 1307 (11th Cir.2001). Nevertheless, calling a document confidential does not make it so in the eyes of the court; these consensual protective orders merely delay the inevitable moment when the court will be called upon to determine whether Rule 26(c) protection is deserved, a decision ultimately rooted in whether the proponent demonstrates "good cause." *See id.* Until a consensual protective order is challenged, however, documents subject thereto remain "presumptively confidential," greatly facilitating discovery by encouraging full disclosure in reliance on assurances of confidentiality. *Id.* at 1307–08; *see also id.* at 1315 n. 15.

Once challenged, however, any decision to enter a Rule 26(c) protective order must be construed in light of the presumption in favor of public access to the courts, *see, e.g., id.* at 1311; *Brown v. Advantage Engineering,* 960 F.2d 1013, 1015 (11th Cir. 1992), for "[w]hat happens in the halls of government is presumptively public business. Judges deliberate in private but issue public decisions after public arguments based on public records." *Union Oil Co. of California v. Leavell,* 220 F.3d 562, 568 (7th Cir.2000).

## 2. The Lack of a Third Party Motion to Unseal

█ Challenges to Rule 26(c) protective orders most commonly arise out of litigation that has drawn intense media scrutiny and public interest, where representatives of the press or other third parties seek access to documents, or even proceedings, that have been sealed. In *Chicago Tribune Company v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, for example, *The Chicago Tribune* and other members of the media intervened in litigation precipitated by a fatal Ford Explorer roll-over crash in order to unseal confidential Firestone discovery documents concerning Firestone tire tread separation, the alleged cause of the crash. Likewise, the press sought to modify or rescind the parties' protective order in *Jones v. Clinton*, 12 F.Supp.2d 931 (E.D.Ark.1998), in order to unseal discovery materials relevant to allegations of sexual harassment against President William J. Clinton. Further, in litigation arising out of the Exxon Corporation's catastrophic oil spill in Prince William Sound, Alaska in 1989, the media successfully challenged Exxon's motion for a "general protective order" sealing various court records and proceedings from the public. *See In re Exxon Valdez*, 17 Media L. Rep. 1509, 1990 U.S. Dist. LEXIS 7999 (D.Alaska Feb. 2, 1990).[6]

Nevertheless, the existence of public scrutiny or active media interest in a case does not control whether Rule 26(c) protection is warranted. Rather, even where no third party challenges a protective order, "[t]he judge is the primary representative of the public interest in the judicial process and is duty-bound therefore to review any request to seal the record (or part of it). He may not rubber stamp a stipulation to seal the record." *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999) (citations omitted). Otherwise, "the interest in publicity will go unprotected unless the media are interested in the case and move to unseal." *Id.* As a preliminary matter, therefore, the fact that no third party has moved to unseal the depositions at issue in this case is largely inconsequential.

## 3. The Effect of CBS' Failure to File the Depositions Under Seal

█ The court is aware of no federal decision directly addressing whether documents designated as confidential and produced pursuant to a protective order automatically lose such protection and become matters of public record simply by virtue of their placement in a public file or transfer to an FRC for temporary storage. Nor has the court located any opinion examining whether federal courts have the power to remove documents from a public storage facility and place them under seal. The court has, however, found several cases that are instructive.

In *Salomon Smith Barney, Inc. v. HBO & Company*, 2001 WL 225040 (S.D.N.Y. 2001), for example, documents designated

---

**6.** Similarly, challenges to protective orders entered in criminal cases are often initiated by the media or other interested third parties. For example, in connection with the 1996 Centennial Olympic Park bombing investigation, the press moved to unseal FBI affidavits used to obtain warrants for searches of suspect Richard Jewell's property. *See In re Four Search Warrants*, 945 F.Supp. 1563 (N.D.Ga.1996). Likewise, a freelance writer sought to unseal FBI surveillance tapes pro-

duced by the government to defense counsel in connection with their investigation into the 1993 World Trade Center bombing, *see United States v. Rahman*, No. S3–93–CR–181–MBM, 1993 WL 454198 (S.D.N.Y. Nov. 2, 1993), and during the criminal trial of suspected "Unabomber" Theodore Kacynski, the media moved to unseal Kacynski's psychiatric competency report. *See United States v. Kaczynski*, 154 F.3d 930 (9th Cir.1998).

as confidential and produced by Bear, Stearns & Co., Inc. ("Bear Stearns") pursuant to a third-party subpoena were filed under seal by the plaintiff and somehow "found their way into the Court's public file." *Id.* at *1. After the action settled, a plaintiff in a related lawsuit discovered the documents in the court's public files and actually quoted from them in its complaint. *See id.* Bear Stearns immediately intervened in order to have the documents removed from the public file, *see id.*, but the court denied the motion, opining that Bear Stearns had failed to show that "any of the information in these documents is non-public information that is material to the securities markets ... [or] that any of the material reflects trade secrets or information of competitive sensitivity." *See id.* at *3. The court's reasoning suggests that, had Bear Stearns made the requisite good cause showing, the court *could* have removed the documents from the public record even though they had already been placed in the court's public files, reviewed by third parties, and actually excerpted for use in other public filings.

Similarly, addressing a federal Freedom of Information Act request, the United States Court of Appeals for the D.C. Circuit observed in *Fund for Constitutional Government v. National Archives and Records Service,* 656 F.2d 856 (D.C.Cir. 1981), that documents do not necessarily lose their status as confidential or become matters of public record even after they are transferred to the legal custody of NARA and physically reviewed and archived by NARA staff. *See id.* at 860, 866, 869. The case has somewhat limited applicability to the instant dispute because the documents at issue therein were records of the Watergate Special Prosecution Force, immune from public disclosure by virtue of a Freedom of Information Act exception for grand jury or other investigatory materials compiled for law enforcement purposes. *See id.* Still, however, the opinion

shows that neither the transfer of documents to a federal storage facility nor their physical handling and review by public employees make such documents part of the public record.

Likewise, several cases suggest, at least inferentially, that sealed or confidential documents do not become matters of public record simply because they are leaked to members of the public, *see Procter & Gamble Co. v. Bankers Trust Co.,* 78 F.3d 219, 222, 227 (6th Cir.1996) (sealed documents were leaked to a *Business Week* journalist who used them to write an article, yet court vacated order enjoining publication of the article on First Amendment grounds, rather than ruling that the leak had thrust the information into the "public domain"), or even where they are actually reported by the press and widely disseminated in another medium. *See Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 603, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978) (upholding protective order sealing media access to Nixon White House tapes even though written transcripts were on the public record, audio versions were played in open court, and there were no restrictions upon press access to or publication of the written versions).

These cases illustrate that CBS' failure to file the depositions at issue under seal does not moot the Estate's retroactive effort to seal them. Rather, provided that the Estate demonstrates good cause, neither the presence of the depositions in the district court's public file nor their subsequent transfer to a federal public storage facility destroys this court's Rule 26(c) power. Further, the possibility that the depositions may have been reviewed by the public while in the custody of the district court clerk's office, or by FRC personnel while in the custody of the East Point FRC, is not, by itself, sufficient to

render the depositions matters of public record.

### 4. The Estate's Request to Reclaim the Depositions at Issue

■ In its joint opposition to the court's February 15th show cause order, and in the two subsequent hearings, the Estate proposed that the court simply return the purportedly confidential documents to the parties as an alternative to unsealing them. However, any request to expunge, withdraw, return, remove, or reclaim documents submitted to a federal court in connection with litigation is tantamount to a motion for a protective order. *See, e.g., In re Knoxville News–Sentinel Co., Inc.,* 723 F.2d 470, 472–73 (6th Cir.1983) (applying Rule 26(c) analysis to motion to remove two exhibits from district court's records); *Krause v. Rhodes,* 535 F.Supp. 338, 347 (N.D.Ohio 1979), *aff'd by,* 671 F.2d 212 (6th Cir.1982) (treating a motion for the return of discovery documents "as an application for a protective order banning publication of such materials"). The Estate's request, under any name, functionally strips the public of access to certain court records; therefore, said request must be evaluated in terms of Rule 26(c).

### B. The Public's Right of Access to the Courts

Although the mere filing of certain documents with a court does not render such material a matter of public record, *see Chicago Tribune Co.,* 263 F.3d at 1311; *In re Policy Management Sys. Corp.,* 67 F.3d 296, 1995 WL 541623, *3 (4th Cir.1995), the presumption in favor of public access to the courts requires that courts exercise their Rule 26(c) authority only in a manner consistent with (1) the common-law right to inspect and copy judicial records; and (2) the First Amendment right of access to court records and documents. *See Chicago Tribune Co.,* 263 F.3d at 1309–10.

### 1. The Common–Law Right of Access

Because the "operations of the courts and the judicial conduct of judges are matters of the utmost public concern," courts have long recognized the public's right to inspect and copy judicial records. *Id.* at 1311 (quoting *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 839, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978)). Nevertheless, this common-law right of access to the courts is not absolute. *See id.* For example, the public has no common-law right of access to discovery materials, exchanged during a process that is typically conducted in private with minimal judicial supervision. *See id.* Further, even where litigants file discovery materials with a court in connection with pretrial discovery motions, such as motions to compel, the supporting discovery documents are not subject to the common-law right of access. *See id.* However, discovery materials filed with the court "in conjunction with pretrial motions that require judicial resolution of the merits [are] subject to the common-law right ...." *Id.* at 1312. This is because, unlike privately exchanged discovery materials, "documents filed as part of a dispositive motion, such as a summary judgment motion," assist the court in determining the parties' substantive rights, serve as a substitute for trial, and render those discovery documents "judicial." *In re Policy Management Sys. Corp.,* 67 F.3d 296, 1995 WL 541623, *3–4 (4th Cir.1995).

Nevertheless, even where the common-law right of access attaches, only in extraordinary circumstances need the denial of such access be justified by a compelling interest. *See Chicago Tribune Co.,* 263 F.3d at 1311 (opining that the compelling interest test would be appropriate "[w]here the trial court conceals the record of the entire case, making no distinction between those documents that are sensi-

tive or privileged and those that are not ....""). Instead, the common-law right of access merely necessitates a "good cause" analysis under Rule 26(c). *See id.* at 1313. This analysis requires the court to (1) determine whether valid grounds for the issuance of a protective order have been presented; and (2) balance the public's interest in access against the litigant's interest in confidentiality. *See id.* Where the proponent of the protective order contends that the materials at issue contain trade secrets, for example, the court must first determine whether such assertion is true. *See id.* To present a *prima facie* case for trade secret protection, the proponent of the protective order must prove that it consistently treated the information as a secret and took steps to guard it, the information is of substantial value to the proponent, the information would be valuable to the proponent's competitors, and the information "derives its value by virtue of the effort of its creation and lack of dissemination." *Id.* If the proponent fails to satisfy this first inquiry, then no "good cause" exists for the protective order. If satisfied, however, the court must then weigh the proponent's interest in confidentiality against the public's interest in access before ultimately deciding whether to issue the order. *See id.*

### 2. The First Amendment Right of Access

Under the First Amendment, the press and public cannot be excluded from a criminal proceeding without a showing that " 'the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest.' " *Id.* at 1310 (quoting *Globe Newspaper Co. v. Superior Court of County of Norfolk,* 457 U.S. 596, 607, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982)). However, public access to civil documents and proceedings receives less First Amendment protection, and "[m]aterials merely gathered as a result of

the civil discovery process ... do not fall within the scope of the constitutional right of access's compelling interest standard." *Id.* Rather, for purposes of determining whether to unseal such discovery materials, the First Amendment right of access standard is "identical to the Rule 26 good cause standard." *Id.* at 1310.

With respect to discovery documents submitted to a court in connection with a dispositive motion, rather than "[m]aterials merely gathered as a result of the civil discovery process," the Eleventh Circuit has presented a somewhat muddled First Amendment analysis. *Id.* Even though documents filed in support of dispositive motions are used to facilitate a resolution of the action on the merits, and are likely considered by courts in lieu of a trial to adjudicate the parties' substantive rights, the Eleventh Circuit has declared that the good cause standard, rather than the compelling interest test, satisfies any First Amendment concerns. *See id.* at 1316 (implicitly rejecting the district court's First Amendment argument in *Van Etten v. Bridgestone/Firestone,* 117 F.Supp.2d 1375, 1381 (S.D.Ga.2000), that "once discovered documents are filed with the Court for its consideration, those documents are part of the public record and subject to heightened scrutiny for closure."); *see also Citizens First Nat'l Bank of Princeton,* 178 F.3d at 946 (suggesting that district courts should apply "good cause" analysis to protective orders even where underlying documents were actually introduced at trial). Therefore, in this case, a showing of good cause under Rule 26(c) would satisfy any common-law right of access or First Amendment problems associated with the sealing of the Dexter Scott King and Phillip Jones depositions.

### C. The Estate's "Good Cause" Showing

■ The above-referenced deposition colloquy among Dexter Scott King, Joseph

M. Beck, and Floyd Abrams indicates that the Estate treated the information at issue as extremely sensitive and took steps to preserve its confidentiality. The Estate permitted its witnesses to render the subject testimony only in reliance upon CBS' repeated assurances of confidentiality, and the dissemination of the financial information at issue could arguably be harmful and/or embarrassing to the Estate's public image and economic well-being. The court questions whether this information has continued arms-length bargaining value to the Estate or its competitors given the passage of time since the underlying litigation commenced; yet, the Estate's persistence in fighting its potential unsealing weighs in favor of its contention that the information at issue contains trade secrets. Moreover, it is important to recognize that here, "the party filing the presumptively confidential discovery material with the court [was] not the party claiming confidentiality, but that party's adversary . . . ." *Chicago Tribune Co.*, 263 F.3d at 1315 n. 15. This factor is critical because, although one "voluntarily forgoes confidentiality when one submits material for dispute resolution in a judicial forum . . . [t]here is no voluntariness, of course, where one's adversary" makes the submission. *Id.*

Because the Estate has presented a *prima facie* case for trade secret protection, "good cause" exists for the sealing the depositions at issue if the Estate's interest in maintaining confidentiality outweighs the public's interest in their uninhibited dissemination. As noted, courts must be wary of closing from the public that which is of the utmost public concern. And, as noted, this case has generated widespread public interest, it has raised novel intellectual property and privacy issues, and it happens to involve a historical figure, and a historical event, of enormous national significance. As such, at the conclusion of the instant protective order litigation, the court's public file will be transferred to NARA for permanent archival preservation, making it available to future researchers, authors, educators, and scholars.

Nevertheless, the deposition testimony at issue herein cannot be described as a matter of the utmost public concern. The information disclosed was by no means critical to the resolution of the underlying copyright dispute; in fact, it arguably had little probative value for either party and was apparently not heavily relied upon at the summary judgment stage. On the other hand, this testimony was elicited during the depositions of the Estate's chief executives, two of the key witnesses in the case. The court is nonetheless of the opinion that the Estate's interest in maintaining confidentiality trumps any public interest in open access to the information at issue, satisfying the second part of the good cause test under Rule 26(c) and justifying the entry of a protective order sealing the deposition testimony from the public. Accordingly, the Estate's motion for a protective order is hereby **GRANTED.**

## IV. Conclusion

Having shown good cause for the issuance of a protective order sealing the deposition testimony at issue in this case, the Estate's request for a protective order is hereby **GRANTED** [75–1]. First, the court records officer is hereby **DIRECTED** to **UNSEAL**, and interfile as part of the public record, all of the previously sealed discovery materials filed by the Estate in support of its motion for summary judgment [34–1; 36–1; 37–1; 54–1]. Second, the court records officer is hereby **DIRECTED** to **REMOVE** the Dexter Scott King and Phillip Jones depositions from the court's public files [33–1]. Third, the court records officer is hereby **DIRECTED** to place each deposition **UNDER SEAL** and to arrange for the depo-

**1368**

sitions' identification, packaging, and transfer to the legal custody of NARA as sealed permanent records. Although the Estate has demonstrated good cause for preventing the public dissemination of the depositions, it is unlikely that the financial matters discussed therein will be of any value or in any way prejudice the Estate's position in contractual negotiations in five years, when the information will be more than a decade old. Therefore, it is hereby **ORDERED** that said seal shall expire **FIVE YEARS** from the date of this order, at which time the depositions of Dexter Scott King and Phillip Jones shall be **UNSEALED** and made part of the public record. Finally, in transferring these sealed materials to the custody of NARA, the court records officer is further **DIRECTED** to clearly indicate to NARA personnel the date upon which the seal should be vacated, pursuant to part A.6(J) of the federal judiciary's document disposition manual. *See Records Management Policies* A.6(J) (2001).