Justice Breyer,
with whom
Justice Ginsburg and Justice Sotomayor join, dissenting.
Like the Court, and substantially for the reasons it gives, I do not think this statute is unconstitutionally vague. But *41 I cannot agree with the Court’s conclusion that the Constitution permits the Government to prosecute the plaintiffs criminally for engaging in coordinated teaching and advocacy furthering the designated organizations’ lawful political objectives. In my view, the Government has not met its burden of showing that an interpretation of the statute that would prohibit this speech- and association-related activity serves the Government’s compelling interest in combating terrorism. And I would interpret the statute as normally placing activity of this kind outside its scope. See Crowell v. Benson, 285 U. S. 22, 62 (1932); Ashwander v. TVA, 297 U. S. 288, 346-347 (1936) (Brandéis, J., concurring).
I
The statute before us forbids “knowingly provid[ing]” “a foreign terrorist organization” with “material support or resources,” defined to include, among other things, “training,” “expert advice or assistance,” “personnel,” and “service.” 18 U.S.C. §§2339B(a)(1), (g)(4); § 2339A(b)(1). The Secretary of State has designated the Kurdistan Workers’ Party (PKK) and the Liberation Tigers of Tamil Eelam (LTTE) as “foreign terrorist organizations” — a designation authorized where the organization is “foreign,” threatens the security of the United States or its nationals, and engages in “terrorist activity,” defined to include “any” of such activities as “highjacking” and “assassination,” or the “use of any . . . weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals.” 62 Fed. Reg. 52650 (1997); 8 U. S. C. § 1182(a)(3)(B)(iii); 18 U.S. C. § 2339B(a)(l).
The plaintiffs, all United States citizens or associations, now seek an injunction and declaration providing that, without violating the statute, they can (1) “train members of [the] PKK on how to use humanitarian and international law to peacefully resolve disputes”; (2) “engage in political advocacy *42 on behalf of Kurds who live in Turkey”; (8) “teach PKK members how to petition various representative bodies such as the United Nations for relief”; and (4) “engage in political advocacy on behalf of Tamils who live in Sri Lanka.” Humanitarian Law Project v. Mukasey, 552 F. 3d 916, 921, n. 1 (CA9 2009); ante, at 14-15. All these activities are of a kind that the First Amendment ordinarily protects.
In my view, the Government has not made the strong showing necessary to justify under the First Amendment the criminal prosecution of those who engage in these activities. All the activities involve the communication and advocacy of political ideas and lawful means of achieving political ends. Even the subjects the plaintiffs wish to teach — using international law to resolve disputes peacefully or petitioning the United Nations, for instance — concern political speech. We cannot avoid the constitutional significance of these facts on the basis that some of this speech takes place outside the United States and is directed at foreign governments, for the activities also involve advocacy in this country directed to our government and its policies. The plaintiffs, for example, wish to write and distribute publications and to speak before the United States Congress. App. 58-59.
That this speech and association for political purposes is the kind of activity to which the First Amendment ordinarily offers its strongest protection is elementary. See New York Times Co. v. Sullivan, 376 U. S. 254, 269 (1964) (The First Amendment “'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people'” (quoting Roth v. United States, 354 U. S. 476, 484 (1957)); Lovell v. City of Griffin, 303 U. S. 444, 452 (1938) (rejecting licensing scheme for distribution of “pamphlets and leaflets,” “historic weapons in the defense of liberty”); R. A. V. v. St. Paul, 505 U. S. 377, 422 (1992) (Stevens, J., concurring in judgment) (“Our First Amendment decisions have created a rough hierarchy in the *43 constitutional protection of speech” in which “[e]ore political speech occupies the highest, most protected position”); Hill v. Colorado, 530 U. S. 703, 787 (2000) (Kennedy, J., dissenting) (“Laws punishing speech which protests the lawfulness or morality of the government’s own policy are the essence of the tyrannical power the First Amendment guards against”); Citizens United v. Federal Election Comm’n, 558 U. S. 310, 349 (2010) (“If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech”).
Although in the Court’s view the statute applies only where the PKK helps to coordinate a defendant’s activities, ante, at 26, the simple fact of “coordination” alone cannot readily remove protection that the First Amendment would otherwise grant. That amendment, after all, also protects the freedom of association. See NAACP v. Claiborne Hardware Co., 458 U. S. 886, 911 (1982) (The First Amendment’s protections “of speech, assembly, association, and petition, ‘though not identical, are inseparable’” (quoting Thomas v. Collins, 323 U. S. 516, 530 (1945))); De Jonge v. Oregon, 299 U. S. 353, 364 (1937) (describing the “right of peaceable assembly” as “a right cognate to those of free speech and free press and ... equally fundamental”); see also Roberts v. United States Jaycees, 468 U. S. 609, 622 (1984). “Coordination” with a political group, like membership, involves association.
“Coordination” with a group that engages in unlawful activity also does not deprive the plaintiffs of the First Amendment’s protection under any traditional “categorical” exception to its protection. The plaintiffs do not propose to solicit a crime. They will not engage in fraud or defamation or circulate obscenity. Cf. United States v. Stevens, 559 U. S. 460, 468-469 (2010) (describing “categories” of unprotected speech). And the First Amendment protects advocacy even of unlawful action so long as that advocacy is not *44 “directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action.” Brandenburg v. Ohio, 395 U. S. 444, 447 (1969) (per curiam) (emphasis added). Here the plaintiffs seek to advocate peaceful, lawful action to secure political ends; and they seek to teach others how to do the same. No one contends that the plaintiffs’ speech to these organizations can be prohibited as incitement under Brandenburg.
Moreover, the Court has previously held that a person who associates with a group that uses unlawful means to achieve its ends does not thereby necessarily forfeit the First Amendment’s protection for freedom of association. See Scales v. United States, 367 U. S. 203, 229 (1961) (“[Q]uasipolitical parties or other groups that may embrace both legal and illegal aims differ from a technical conspiracy, which is defined by its criminal purpose”); see also NAACP, supra, at 908 (“The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected”). Rather, the Court has pointed out in respect to associating with a group advocating overthrow of the Government through force and violence: “If the persons assembling have committed crimes elsewhere ..., they may be prosecuted for their . . . violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge.” De Jonge, supra, at 365 (striking down conviction for attending and assisting at Communist Party meeting because “[notwithstanding [the party’s] objectives, the defendant still enjoyed his personal right of free speech and to take part in a peaceable assembly having a lawful purpose”).
Not even the “serious and deadly problem” of international terrorism can require automatic forfeiture of First Amendment rights. § 301(a)(1), 110 Stat. 1247, note following 18 *45 U. S. C. § 2339B (Findings and Purpose). Cf. §2339B(i) (instructing courts not to “constru[e] or appl[y the statute] so as to abridge the exercise of rights guaranteed under the First Amendment”). After all, this Court has recognized that not “ ‘[e]ven the war power . .. remove[s] constitutional limitations safeguarding essential liberties.’” United States v. Robel, 389 U. S. 258, 264 (1967) (quoting Home Building & Loan Assn. v. Blaisdell, 290 U. S. 398, 426 (1934)). See also Abrams v. United States, 250 U. S. 616, 628 (1919) (Holmes, J., dissenting) (“[A]s against dangers peculiar to war, as against others, the principle of the right to free speech is always the same”). Thus, there is no general First Amendment exception that applies here. If the statute is constitutional in this context, it would have to come with a strong justification attached.
It is not surprising that the majority, in determining the constitutionality of criminally prohibiting the plaintiffs’ proposed activities, would apply, not the kind of intermediate First Amendment standard that applies to conduct, but “ 'a more demanding standard.’” Ante, at 28 (quoting Texas v. Johnson, 491 U. S. 397, 403 (1989)). Indeed, where, as here, a statute applies criminal penalties and at least arguably does so on the basis of content-based distinctions, I should think we would scrutinize the statute and justifications “strictly” — to determine whether the prohibition is justified by a “compelling” need that cannot be “less restrictively” accommodated. See Houston v. Hill, 482 U. S. 451, 459 (1987) (criminal penalties); Ashcroft v. American Civil Liberties Union, 535 U. S. 564, 573 (2002) (content-based); Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., 502 U. S. 105, 118 (1991) (same); Consolidated Edison Co. of N. Y. v. Public Serv. Comm’n of N. Y. 447 U. S. 530, 540 (1980) (strict scrutiny); First Nat. Bank of Boston v. Bellotti, 435 U. S. 765, 786 (1978) (same).
But, even if we assume for argument’s sake that “strict scrutiny” does not apply, no one can deny that we must at *46 the very least “measure the validity of the means adopted by Congress against both the goal it has sought to achieve and the specific prohibitions of the First Amendment.” Robel, supra, at 268, n. 20 (describing constitutional task where the Court is faced “with a clear conflict between a federal statute enacted in the interests of national security and an individual’s exercise of his First Amendment rights”). And here I need go no further, for I doubt that the statute, as the Government would interpret it, can survive any reasonably applicable First Amendment standard. See, e. g., Turner Broadcasting System, Inc. v. FCC, 520 U. S. 180, 189 (1997) (describing intermediate scrutiny). Cf. Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 402 (2000) (Breyer, J., concurring) (examining whether a statute worked speech-related harm “out of proportion to the statute’s salutary effects upon” other interests).
The Government does identify a compelling countervailing interest, namely, the interest in protecting the security of the United States and its nationals from the threats that foreign terrorist organizations pose by denying those organizations financial and other fungible resources. I do not dispute the importance of this interest. But I do dispute whether the interest can justify the statute’s criminal prohibition. To put the matter more specifically, precisely how does application of the statute to the protected activities before us help achieve that important security-related end? See Simon & Schuster, supra, at 118 (requiring that “narrowly drawn” means further a “compelling state interest” by the least restrictive means (internal quotation marks omitted)); Turner, supra, at 189 (requiring “advance[ment of] important governmental interests unrelated to the suppression of free speech” without “burdening] substantially more speech than necessary to further those interests”); Robel, supra, at 268, n. 20 (requiring measurement of the “means adopted by Congress against . . . the [security] goal it has sought to achieve”). See also Nixon, supra, at 402 (Breyer, J., con *47 curring); Federal Election Comm’n v. Wisconsin Right to Life, Inc., 551 U. S. 449, 478 (2007) (opinion of Roberts, C. J.) (“A court. . . must ensure that [the interest justifying a statutory restriction] supports each application of [the] statute”).
The Government makes two efforts to answer this question. First, the Government says that the plaintiffs’ support for these organizations is “fungible” in the same sense as other forms of banned support. Being fungible, the plaintiffs’ support could, for example, free up other resources, which the organization might put to terrorist ends. Brief for Respondents in No. 09-89, pp. 54-56 (hereinafter Government Brief).
The proposition that the two very different kinds of “support” are “fungible,” however, is not obviously true. There is no obvious way in which undertaking advocacy for political change through peaceful means or teaching the PKK and LTTE, say, how to petition the United Nations for political change is fungible with other resources that might be put to more sinister ends in the way that donations of money, food, or computer training are fungible. It is far from obvious that these advocacy activities can themselves be redirected, or will free other resources that can be directed, toward terrorist ends. Thus, we must determine whether the Government has come forward with evidence to support its claim.
The Government has provided us with no empirical information that might convincingly support this claim. Instead, the Government cites only to evidence that Congress was concerned about the “fungible” nature in general of resources, predominately money and material goods. It points to a congressional finding that “foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct.” § 301(a)(7), 110 Stat. 1247, note following 18 U. S. C. §2339B (emphasis added). It also points *48 to a House Report’s statement that “supplying] funds, goods, or services” would “hel[p] defray the cost to the terrorist organization of running the ostensibly legitimate activities,” and “in turn fre[e] an equal sum that can then be spent on terrorist activities.” H. R. Rep. No. 104-383, p. 81 (1995) (emphasis added). Finally, the Government refers to a State Department official’s affidavit describing how ostensibly charitable contributions have either been “redirected” to terrorist ends or, even if spent charitably, have “unencumhex[ed] funds raised from other sources for use in facilitating violent, terrorist activities and gaining political support for these activities.” Declaration of Kenneth R. McKune, App. 134, 136 (emphasis added).
The most one can say in the Government’s favor about these statements is that they might be read as offering highly general support for its argument. The statements do not, however, explain in any detail how the plaintiffs’ political-advocacy-related activities might actually be “fungible” and therefore capable of being diverted to terrorist use. Nor do they indicate that Congress itself was concerned with “support” of this kind. The affidavit refers to “funds,” “financing,” and “goods” — none of which encompasses the plaintiffs’ activities. Ibid. The statutory statement and the House Report use broad terms like “contributions” and “services” that might be construed as encompassing the plaintiffs’ activities. But in context, those terms are more naturally understood as referring to contributions of goods, money, or training and other services (say, computer programming) that could be diverted to, or free funding for, terrorist ends. See infra, at 55. Peaceful political advocacy does not obviously fall into these categories. And the statute itself suggests that Congress did not intend to curtail freedom of speech or association. See §2339B(i) (“Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment”); see also infra, at 58.
*49 Second, the Government says that the plaintiffs’ proposed activities will “bolstefr] a terrorist organization’s efficacy and strength in a community” and “underminfe] this nation’s efforts to delegitimize and weaken these groups.” Government Brief 56 (emphasis added). In the Court’s view, too, the Constitution permits application of the statute to activities of the kind at issue in part because those activities could provide a group that engages in terrorism with “legitimacy.” Ante, at 30. The Court suggests that, armed with this greater “legitimacy,” these organizations will more readily be able to obtain material support of the kinds Congress plainly intended to ban — money, arms, lodging, and the like. See ibid.
Yet the Government does not claim that the statute forbids any speech “legitimating” a terrorist group. Rather, it reads the statute as permitting (1) membership in terrorist organizations, (2) “peaceably assembling with members of the PKK and LTTE for lawful discussion,” or (3) “independent advocacy” on behalf of these organizations. Government Brief 66, 61, 13. The Court, too, emphasizes that activities not “coordinated with” the terrorist groups are not banned. See ante, at 26, 31, 36 (emphasis added). And it argues that speaking, writing, and teaching aimed at furthering a terrorist organization’s peaceful political ends could “makfe] it easier for those groups to persist, to recruit members, and to raise funds.” Ante, at 30.
But this “legitimacy” justification cannot by itself warrant suppression of political speech, advocacy, and association. Speech, association, and related activities on behalf of a group will often, perhaps always, help to legitimate that group. Thus, were the law to accept a “legitimating” effect, in and of itself and without qualification, as providing sufficient grounds for imposing such a ban, the First Amendment battle would be lost in untold instances where it should be won. Once one accepts this argument, there is no natural stopping place. The argument applies as strongly to “inde *50 pendent” as to “coordinated” advocacy. But see ante, at 31-32. That fact is reflected in part in the Government’s claim that the ban here, so supported, prohibits a lawyer hired by a designated group from filing on behalf of that group an amicus brief before the United Nations or even before this Court. ' See Tr. of Oral Arg. 47-49, 53.
That fact is also reflected in the difficulty of drawing a line designed to accept the legitimacy argument in some instances but not in others. It is inordinately difficult to distinguish when speech activity will and when it will not initiate the chain of causation the Court suggests — a chain that leads from peaceful advocacy to “legitimacy” to increased support for the group to an increased supply of material goods that support its terrorist activities. Even were we to find some such line of distinction, its application would seem so inherently uncertain that it would often, perhaps always, “chill” protected speech beyond its boundary. In short, the justification, put forward simply in abstract terms and without limitation, must always, or it will never, be sufficient. Given the nature of the plaintiffs’ activities, “always” cannot possibly be the First Amendment’s answer.
Regardless, the “legitimacy” justification itself is inconsistent with critically important First Amendment case law. Consider the cases involving the protection the First Amendment offered those who joined the Communist Party intending only to further its peaceful activities. In those cases, this Court took account of congressional findings that the Communist Party not only advocated theoretically but also sought to put into practice the overthrow of our Government through force and violence. The Court had previously accepted Congress’ determinations that the American Communist Party was a “Communist action organizatio[n]” which (1) acted under the “control, direction, and discipline” of the world Communist movement, a movement that sought to employ “espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian die *51 tatorship,” and (2) “endeavor[ed]” to bring about “the overthrow of existing governments by . . . force if necessary.” Communist Party of United States v. Subversive Activities Control Bd., 367 U. S. 1, 5-6 (1961) (internal quotation marks omitted).
Nonetheless, the Court held that the First Amendment protected an American’s right to belong to that party — despite whatever “legitimating” effect membership might have had — as long as the person did not share the party’s unlawful purposes. See, e. g., De Jonge, 299 U. S. 353; Scales, 367 U. S., at 228-230; Elfbrandt v. Russell, 384 U. S. 11, 17 (1966); Keyishian v. Board of Regents of Univ. of State of N. Y., 385 U. S. 589, 605-610 (1967); Robel, 389 U. S. 258 (holding that national security interests did not justify overbroad criminal prohibition on members of Communist-affiliated organizations working in any defense-related facility). As I have pointed out, those cases draw further support from other cases permitting pure advocacy of even the most unlawful activity — as long as that advocacy is not “directed to inciting or producing imminent lawless action and . . . likely to incite or produce such action.” Brandenburg, 395 U. S., at 447. The Government’s “legitimating” theory would seem to apply to these cases with equal justifying force; and, if recognized, it would have led this Court to conclusions other than those it reached.
Nor can the Government overcome these considerations simply by narrowing the covered activities to those that involve coordinated, rather than independent, advocacy. Conversations, discussions, or logistical arrangements might well prove necessary to carry out the speech-related activities here at issue (just as conversations and discussions are a necessary part of membership in any organization). The Government does not distinguish this kind of “coordination” from any other. I am not aware of any form of words that might be used to describe “coordination” that would not, at a minimum, seriously chill not only the kind of activities the *52 plaintiffs raise before us, but also the “independent advocacy” the Government purports to permit. And, as for the Government’s willingness to distinguish independent advocacy from coordinated advocacy, the former is more likely, not less likely, to confer legitimacy than the latter. Thus, other things being equal, the distinction “coordination” makes is arbitrary in respect to furthering the statute’s purposes. And a rule of law that finds the “legitimacy” argument adequate in respect to the latter would have a hard time distinguishing a statute that sought to attack the former.
Consider the majority’s development of the Government’s themes. First, the majority discusses the plaintiffs’ proposal to “ ‘train members of [the] PKK on how to use humanitarian and international law to peacefully resolve disputes.’ ” Ante, at 36 (quoting 552 F. 3d, at 921, n. 1). The majority justifies the criminalization of this activity in significant part on the ground that “peaceful negotiation^]” might just “bu[y] time . . ., lulling opponents into complacency.” Ante, at 37. And the PKK might use its new information about “the structures of the international legal system ... to threaten, manipulate, and disrupt.” Ibid.
What is one to say about these arguments — arguments that would deny First Amendment protection to the peaceful teaching of international human rights law on the ground that a little knowledge about “the international legal system” is too dangerous a thing; that an opponent’s subsequent willingness to negotiate might be faked, so let’s not teach him how to try? What might be said of these claims by those who live, as we do, in a nation committed to the resolution of disputes through “deliberative forces”? Whitney v. California, 274 U. S. 357, 375 (1927) (Brandeis, J., concurring).
In my own view, the majority’s arguments stretch the concept of “fungibility” beyond constitutional limits. Neither Congress nor the Government advanced these particular hy *53 pothetical claims. I am not aware of any case in this Court — not Gitlow v. New York, 268 U. S. 652 (1925), not Schenck v. United States, 249 U. S. 47 (1919), not Abrams, 250 U. S. 616, not the later Communist Party cases decided during the heat of the Cold War — in which the Court accepted anything like a claim that speech or teaching might be criminalized lest it, e. g., buy negotiating time for an opponent who would put that time to bad use.
Moreover, the risk that those who are taught will put otherwise innocent speech or knowledge to bad use is omnipresent, at least where that risk rests on little more than (even informed) speculation. Hence to accept this kind of argument without more and to apply it to the teaching of a subject such as international human rights law is to adopt a rule of law that, contrary to the Constitution’s text and First Amendment precedent, would automatically forbid the teaching of any subject in a case where national security interests conflict with the First Amendment. The Constitution does not allow all such conflicts to be decided in the Government’s favor.
The majority, as I have said, cannot limit the scope of its arguments through its claim that the plaintiffs remain free to engage in the protected activity as long as it is not “coordinated.” That is because there is no practical way to organize classes for a group (say, wishing to learn about human rights law) without “coordination.” Nor can the majority limit the scope of its argument by pointing to some special limiting circumstance present here. That is because the only evidence the majority offers to support its general claim consists of a single reference to a book about terrorism, which the Government did not mention, and which apparently says no more than that at one time the PKK suspended its armed struggle and then returned to it.
Second, the majority discusses the plaintiffs’ proposal to “ ‘teach PKK members how to petition various representative bodies such as the United Nations for relief.’” Ante, *54 at 37 (quoting 552 F. 3d, at 921, n. 1; emphasis added). The majority’s only argument with respect to this proposal is that the relief obtained “could readily include monetary aid,” which the PKK might use to buy guns. Ante, at 37. The majority misunderstands the word “relief.” In this context, as the record makes clear, the word “relief” does not refer to “money.” It refers to recognition under the Geneva Conventions. See App. 57-58 (2003 Complaint); id., at 79-80 (1998 Complaint); id., at 113 (Fertig Declaration); see also Tr. of Oral Arg. 63 (plaintiffs’ counsel denying that plaintiffs seek to teach about obtaining relief in the form of money).
Throughout, the majority emphasizes that it would defer strongly to Congress’ “informed judgment.” See, e. g., ante, at 34. But here, there is no evidence that Congress has made such a judgment regarding the specific activities at issue in these cases. See infra, at 59-60. In any event, “[wjhenever the fundamental rights of free speech and assembly are alleged to have been invaded, it must remain open [for judicial determination] whether there actually did exist at the time a clear danger; whether the danger, if any, was imminent; and whether the evil apprehended was one so substantial as to justify the stringent restriction interposed by the legislature.” Whitney, supra, at 378-379 (Brandeis, J., concurring). In such circumstances, the “judicial function commands analysis of whether the specific conduct charged falls within the reach of the statute and if so whether the legislation is consonant with the Constitution.” Landmark Communications, Inc. v. Virginia, 435 U. S. 829, 844 (1978). Hence, a legislative declaration “does not preclude enquiry into the question whether, at the time and under the circumstances, the conditions existed which are essential to validity under the Federal Constitution.” Whitney, supra, at 378; see also Landmark, supra, at 843 (“Deference to a legislative finding cannot limit judicial inquiry when First Amendment rights are at stake”).
*55 I concede that the Government’s expertise in foreign affairs may warrant deference in respect to many matters, e. g., our relations with Turkey. Cf. ante, at 32-33. But it remains for this Court to decide whether the Government has shown that such an interest justifies criminalizing speech activity otherwise protected by the First Amendment. And the fact that other nations may like us less for granting that protection cannot in and of itself carry the day.
Finally, I would reemphasize that neither the Government nor the majority points to any specific facts that show that the speech-related activities before us are fungible in some special way or confer some special legitimacy upon the PKK. Rather, their arguments in this respect are general and speculative. Those arguments would apply to virtually all speech-related support for a dual-purpose group’s peaceful activities (irrespective of whether the speech-related activity is coordinated). Both First Amendment logic and First Amendment case law prevent us from “sacrific[ing] First Amendment protections for so speculative a gain.” Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U. S. 94, 127 (1973); see also Consolidated Edison Co., 447 U. S., at 543 (rejecting proffered state interest not supported in record because “[m]ere speculation of harm does not constitute a compelling state interest”).
II
For the reasons I have set forth, I believe application of the statute as the Government interprets it would gravely and without adequate justification injure interests of the kind the First Amendment protects. Thus, there is “a serious doubt” as to the statute’s constitutionality. Crowell, 285 U. S., at 62. And where that is so, we must “ascertain whether a construction of the statute is fairly possible by which the question may be avoided.” Ibid.; see also Ashwander, 297 U. S., at 346-348 (Brandeis, J., concurring); Zadvydas v. Davis, 533 U. S. 678, 689 (2001); United States *56 v. X-Citement Video, Inc., 513 U. S. 64, 78 (1994); United States v. Jin Fuey Moy, 241 U. S. 394, 401 (1916).
I believe that a construction that would avoid the constitutional problem is “fairly possible.” In particular, I would read the statute as criminalizing First Amendment protected pure speech and association only when the defendant knows or intends that those activities will assist the organization’s unlawful terrorist actions. Under this reading, the Government would have to show, at a minimum, that such defendants provided support that they knew was significantly likely to help the organization pursue its unlawful terrorist aims.
A person acts with the requisite knowledge if he is aware of (or willfully blinds himself to) a significant likelihood that his or her conduct will materially support the organization’s terrorist ends. See Allen v. United States, 164 U. S. 492, 496 (1896); cf. ALI, Model Penal Code § 2.02(2)(b)(ii) (1962). See also United States v. Santos, 553 U. S. 507, 521 (2008) (plurality opinion); cf. Model Penal Code §2.02(7) (willful blindness); S. Rep. No. 95-605, pt. 1, pp. 59-60 (1977). A person also acts with the requisite intent if it is his “conscious objective” (or purpose) to further those same terrorist ends. See United States v. Bailey, 444 U. S. 394, 408 (1980); Model Penal Code §§2.02(2)(a) and 2.02(5) (“When acting knowingly suffices to establish an element, such element also is established if a person acts purposely”). On the other hand, for the reasons I have set out, see supra, at 49-52, knowledge or intent that this assistance (aimed at lawful activities) could or would help further terrorism simply by helping to legitimate the organization is not sufficient.
This reading of the statute protects those who engage in pure speech and association ordinarily protected by the First Amendment. But it does not protect that activity where a defendant purposefully intends it to help terrorism or where a defendant knows (or willfully blinds himself to the fact) that the activity is significantly likely to assist terrorism. *57 Where the activity fits into these categories of purposefully or knowingly supporting terrorist ends, the act of providing material support to a known terrorist organization bears a close enough relation to terrorist acts that, in my view, it likely can be prohibited notwithstanding any First Amendment interest. Cf. Brandenburg, 395 U. S. 444. At the same time, this reading does not require the Government to undertake the difficult task of proving which, as between peaceful and nonpeaceful purposes, a defendant specifically preferred; knowledge is enough. See Bailey, supra, at 405 (defining specific intent).
This reading is consistent with the statute’s text. The statute prohibits “knowingly providing] material support or resources to a foreign terrorist organization.” §2339B(a)(l) (emphasis added). Normally we read a criminal statute as applying a mens rea requirement to all of the subsequently listed elements of the crime. See Flores-Figueroa v. United States, 556 U. S. 646, 652 (2009). So read, the defendant would have to know or intend (1) that he is providing support or resources, (2) that he is providing that support to a foreign terrorist organization, and (3) that he is providing support that is material, meaning (4) that his support bears a significant likelihood of furthering the organization’s terrorist ends.
This fourth requirement flows directly from the statute’s use of the word “material.” That word can mean being of a physical or worldly nature, but it also can mean “being of real importance or great consequence.” Webster’s Third New International Dictionary 1392 (1961). Here, it must mean the latter, for otherwise the statute, applying only to physical aid, would not apply to speech at all. See also §2339A(b)(l) (defining “‘material support or resources’” as “any property, tangible or intangible” (emphasis added)). And if the statute applies only to support that would likely be of real importance or great consequence, it must have importance or consequence in respect to the organization’s *58 terrorist activities. That is because support that is not significantly likely to help terrorist activities, for purposes of this statute, neither has “importance” nor is of “great consequence.”
The statutory definition of “material support” poses no problem. The statute defines “material support” through reference to a list of terms, including those at issue here— “training,” “expert advice or assistance,” “personnel,” and “service.” § 2339B(g)(4); § 2339A(b)(l). Since these latter terms all fall under the definition of the term “material support,” these activities fall within the statute’s scope only when they too are “material.” Cf. Stevens, 559 U. S., at 474 (definitional phrase may take meaning from the term to be defined (citing Leocal v. Ashcroft, 543 U. S. 1, 11 (2004))).
Thus, textually speaking, a statutory requirement that the defendant knew the support was material can be read to require the Government to show that the defendant knew that the consequences of his acts had a significant likelihood of furthering the organization’s terrorist, not just its lawful, aims.
I need not decide whether this is the only possible reading of the statute in cases where “material support” takes the form of “currency,” “property,” “monetary instruments,” “financial securities,” “financial services,” “lodging,” “safehouses,” “false documentation or identification,” “weapons,” “lethal substances,” or “explosives,” and the like. § 2339A(b)(l). Those kinds of aid are inherently more likely to help an organization’s terrorist activities, either directly or because they are fungible in nature. Thus, to show that an individual has provided support of those kinds will normally prove sufficient for conviction (assuming the statute’s other requirements are met). But where support consists of pure speech or association, I would indulge in no such presumption. Rather, the Government would have to prove that the defendant knew he was providing support significantly likely to help the organization pursue its unlawful ter *59 rorist aims (or, alternatively, that the defendant intended the support to be so used).
The statute’s history strongly supports this reading. That history makes clear that Congress primarily sought to end assistance that takes the form of fungible donations of money or goods. See, e. g., H. R. Rep. No. 104-383, at 38, 43-45,81; supra, at 47-48. It shows that Congress, when referring to “expert services and assistance,” for example, had in mind training that was sufficiently fungible to further terrorism directly, such as an aviation expert’s giving “advice” that “facilitate[s] an aircraft hijacking” or an accountant’s giving “advice” that will “facilitate the concealment of funds used to support terrorist activities.” Hearing on Administration’s Draft Anti-Terrorism Act of 2001 before the House Committee on the Judiciary, 107th Cong., 1st Sess., 61 (2001).
And the Chairman of the Senate Committee on the Judiciary, when reporting the relevant bill from Committee, told the Senate:
“This bill also includes provisions making it a crime to knowingly provide material support to the terrorist functions of foreign groups designated by a Presidential finding to be engaged in terrorist activities.” 142 Cong. Rec. 7550 (1996) (statement of Sen. Hatch) (emphasis added).
He then added:
“I am convinced we have crafted a narrow but effective designation provision which meets these obligations while safeguarding the freedom to associate, which none of us would willingly give up.” Id., at 7557 (emphasis added).
Consistent with this view, the statute itself says:
“Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under *60 the First Amendment to the Constitution of the United States.” § 2839B(i).
In any event, the principle of constitutional avoidance demands this interpretation. As Part II makes clear, there is a “serious” doubt — indeed, a “grave” doubt — about the constitutionality of the statute insofar as it is read to criminalize the activities before us. Crowell, 285 U. S., at 62; see also Ashwander, 297 U. S., at 346-348 (Brandeis, J., concurring); Jin Fuey Moy, 241 U. S., at 401. We therefore must “read the statute to eliminate” that constitutional “doub[t] so long as such a reading is not plainly contrary to the intent of Congress.” X-Citement Video, Inc., 513 U. S., at 78.
For this reason, the majority’s statutory claim that Congress did not use the word “knowingly” as I would use it, ante, at 16-18, and n. 3, is beside the point. Our consequent reading is consistent with the statute’s text; it is consistent with Congress’ basic intent; it interprets but does not significantly add to what the statute otherwise contains. Cf., e. g., United States v. Thirty-seven Photographs, 402 U. S. 363, 373-374 (1971) (constitutionally compelled to add requirement that “forfeiture proceedings be commenced within 14 days and completed within 60 days” despite absence of any statutory time limits); NLRB v. Catholic Bishop of Chicago, 440 U. S. 490, 507 (1979) (constitutionally compelled to interpret “employer” as implicitly excluding “church-operated schools” despite silence and eight other different but explicit exceptions). We should adopt it.
Ill
Having interpreted the statute to impose the mens rea requirement just described, I would remand the cases so that the lower courts could consider more specifically the precise activities in which the plaintiffs still wish to engage and determine whether and to what extent a grant of declaratory and injunctive relief were warranted. I do not see why the majority does not also remand the cases for consideration *61 of the plaintiffs’ activities relating to “advocating” for the organizations’ peaceful causes. See ante, at 24-25, 37-38.
The majority does not remand, apparently because it believes the plaintiffs lose automatically in that these “advocacy” claims are too general. It adds that the plaintiffs did not “suggest what exactly their ‘advocacy’ would consist of.” Ante, at 37. But the majority is wrong about the lack of specificity. The record contains complaints and affidavits, which describe in detail the forms of advocacy these groups have previously engaged in and in which they would like to continue to engage. See App. 56-63, 78-87, 95-99, 110-123.
Moreover, the majority properly rejects the Government’s argument that the plaintiffs’ speech-related activities amount to “conduct” and should be reviewed as such. Government Brief 44-57. Hence, I should think the majority would wish the lower courts to reconsider this aspect of the cases, applying a proper standard of review. See, e. g., Philip Morris USA v. Williams, 549 U. S. 346, 357-358 (2007); Johnson v. California, 543 U. S. 499, 515 (2005); cf. Ricci v. DeStefano, 557 U. S. 557, 631 (2009) (Ginsburg, J., dissenting) (“When this Court formulates a new legal rule, the ordinary course is to remand and allow the lower courts to apply the rule in the first instance”).
IV
In sum, these cases require us to consider how to apply the First Amendment where national security interests are at stake. When deciding such cases, courts are aware and must respect the fact that the Constitution entrusts to the Executive and Legislative Branches the power to provide for the national defense, and that it grants particular authority to the President in matters of foreign affairs. Nonetheless, this Court has also made clear that authority and expertise in these matters do not automatically trump the Court’s own obligation to secure the protection that the Constitution grants to individuals. Cf. Hamdi v. Rumsfeld, *62 542 U. S. 507, 536 (2004) (“We have long since made clear that a state of war is not a blank check ... when it comes to the rights of th[is] Nation’s citizens”). In these cases, for the reasons I have stated, I believe the Court has failed to examine the Government’s justifications with sufficient care. It has failed to insist upon specific evidence, rather than general assertion. It has failed to require tailoring of means to fit compelling ends. And ultimately it deprives the individuals before us of the protection that the First Amendment demands.
That is why, with respect, I dissent.